IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHAEL FETHEROLF,

    Petitioner,

v.

TIM SHOOP, WARDEN,
CHILLICOTHE CORRECTIONAL
INST.,

    Respondent.

Case No. 2:19-cv-00168
Judge Edmund A. Sargus, Jr.
Chief Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

Petitioner, a state prisoner, brings this Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner has filed a Motion to Expand the Record, Motions for Discovery, and Motion for Reconsideration on the Motion to Appoint Counsel. For the reasons that follow, the foregoing motions (ECF Nos. 21, 22, 27, 43) are **DENIED**.

### I. Facts and Procedural History

Petitioner challenges his convictions after a jury trial in the Union County Court of Common Pleas on charges of rape and intimidation of a witness. The Ohio Third District Court of Appeals summarized the facts and procedural history of the case as follows:

> {¶ 3} On January 23, 2015, a superseding indictment was filed against Fetherolf. The superseding indictment alleged 33 counts against Fetherolf, beginning with the same allegation of Rape previously indicted (Count 1) and the same allegation of Gross Sexual Imposition previously indicted (Count 2). The superseding indictment then also alleged fifteen counts of Rape in violation of R.C. 2907.02(A)(1)(b), all felonies of the first degree (Counts 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31), fifteen counts of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), all felonies of the third degree (Counts 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32), and one count of Intimidation of an Attorney, Victim or Witness in a Criminal Case in violation of R.C. 2921.04(B), a felony of the third degree (Count 33). The new Rape and Gross Sexual Imposition charges were related to similar allegations of digital penetration that Fetherolf allegedly perpetrated against A.C.

when Fetherolf had physical custody of A.C. on weekends between March of 2011 and September of 2013. The Intimidation of a Witness charge alleged that Fetherolf threatened to spank A.C. if she told anyone about the alleged incidents, and that she would be in trouble if she told anyone. Fetherolf pled not guilty to the charges.

{¶ 4} On March 7–10, 2016, a jury trial was held. [FN2] Testimony at trial indicated that A.C. was born in March of 2006 to mother Heather C., but it was not determined that Fetherolf was A.C.'s father until a DNA test was done when A.C. was approximately two and a half years old. After Fetherolf was determined to be A.C.'s father, Heather testified that she contacted Fetherolf and asked if he wanted to be involved in A.C.'s life. Fetherolf indicated that he did and Heather began providing Fetherolf with visitation. [FN3] Heather testified that as time passed she started allowing overnight visits between A.C. and Fetherolf and that those overnight visits grew into every other weekend.

FN2: A visiting judge presided over the trial.

FN3: Heather testified that all visitation was established outside of court proceedings.

{¶ 5} Heather testified that on Friday September 20, 2013, she dropped A.C. off with Fetherolf for his weekend visitation with the intent being that Fetherolf or his grandmother would return A.C. on Sunday. Testimony indicated that Fetherolf was staying in his grandmother's trailer at the time and that he primarily exercised his visitation with A.C. at the trailer.

{¶ 6} Heather indicated that she was contacted by Fetherolf on Saturday September 21st and Fetherolf asked her to drop off extra clothes for A.C., which she did. Then, Heather testified that she received a text message from Fetherolf on Sunday September 22, 2013, stating that his grandmother would bring A.C. home on Monday morning instead of Sunday. On Monday morning, Heather testified that she received a message from Fetherolf wherein he stated that he woke up late and that he or his grandmother would bring A.C. home that night or take her directly to school on Tuesday, September 24, 2013. Heather testified that she was upset with the situation.

{¶ 7} Heather indicated that the next morning, Tuesday, she received a call from the school inquiring about A.C. because she was not at school. Heather then began trying to contact Fetherolf. Heather testified that when she could not get in contact with Fetherolf, she called the police. The police located Fetherolf that day and facilitated A.C.'s return to Heather.

{¶ 8} After A.C. was returned to her, Heather took A.C. home. Heather commented that A.C. was dirty and looked like she needed a bath. Heather indicated that it was around lunchtime and A.C. was hungry so Heather made her food. Heather testified that A.C. looked "down" but was responsive. Heather testified that she asked A.C.

2

about her weekend and eventually asked if A.C. got in trouble at Fetherolf's. Heather testified that A.C. put her head down, which was unusual behavior for A.C.

{¶ 9} Heather testified that A.C. asked to take her lunch upstairs to her room. Heather indicated that it was fine and permitted A.C. to go upstairs. Heather testified that shortly thereafter, Heather's sister Kara went upstairs to talk to A.C. and a few minutes later Kara came down, "pale" with "a look of shock" and said that Heather needed to talk to A.C. (March 7, 2016, Tr. at 196).

{¶ 10} Heather testified that she then talked to her daughter and asked what was wrong repeatedly and Heather testified that A.C. initially told her that she did not want to say anything because she was afraid of being spanked or getting in trouble. Heather testified that she conveyed to A.C. that she was not going to get into trouble and that A.C. then told her that Fetherolf touched her "in her butterfly," and indicated her vagina. (*Id*. at 197). Heather testified that she asked A.C. what she meant and A.C. demonstrated with her hand.

She put her palm up. She took two fingers up and started going up and down like this on her palm and then she stuck one finger inside of her palm. And I asked her what she meant by that and she said that he had stuck a finger inside of her.

(*Id*.) Heather testified that A.C. also told her that Fetherolf threatened to spank A.C. if A.C. did not allow him to touch her "butterfly." (March 7, 2016, Tr. at 197). Heather testified that A.C. indicated that similar acts had been going on since A.C. was between four and five years old. Kara, who had already talked to A.C. at that point, testified that A.C. had told her essentially the same story, that Fetherolf touched her in her "no-no" parts, indicating her vaginal area. (March 8, 2016, Tr. at 16).

{¶ 11} Heather testified that after hearing A.C.'s story she was upset and she went downstairs to make some phone calls. Kara took A.C. to a nearby park for 20–30 minutes while Heather made the calls. Heather testified that she called her mother, Linda, who came to the house. Linda also spoke with A.C. and Linda testified that A.C. revealed to her that Fetherolf had "stuck his fingers up in [her]" and that it had been going on since A.C. was four or five years old. (*Id*. at 43). According to Linda, A.C. also said that she did not tell anyone because her father had threatened to spank her if she did. [FN4]

FN4: Fetherolf's attorney objected to testimony related to A.C.'s disclosures to Heather, Kara, and Linda. The trial court overruled these objections stating that they were, inter alia, excited utterances. Fetherolf does not claim on appeal that it was error for the trial court to permit these particular statements.

{¶ 12} After Heather finished making phone calls to, inter alia, her pediatrician, A.C. was taken to a nearby hospital and referred to a separate hospital that could more adequately handle a sexual assault examination. A.C. was then taken to the

3

emergency room at Nationwide Children's Hospital by Heather, Kara, and Kara's boyfriend.

{¶ 13} At the emergency room, A.C. met with a number of medical professionals including an emergency room physician and a Sexual Assault Nurse Examiner ("SANE"). A.C. also met with a social worker, Lauren Kato, who took A.C.'s initial history. A.C. informed the social worker and medical personnel that Fetherolf had been drinking and had "swirl[ed]" his fingers on her "bad spot." (March 8, 2016, Tr. at 109). Kato testified that A.C. indicated that Fetherolf threatened to spank A.C. if she did not cooperate. Kato testified that A.C.'s disclosure was consistent with what A.C. had told her mother based on Kato's interview with Heather.

{¶ 14} Shortly thereafter on the same date, A.C. was physically examined by Dr. Helen McManus, an emergency room physician. Dr. McManus testified that she used the initial history provided by Kato to direct her care. Dr. McManus testified that although she did not find any marks on A.C. the exam was consistent with an allegation of touching, which would often not leave any marks. [FN5] Dr. McManus testified that following her examination she concluded that A.C. had been sexually abused.

FN5: Dr. McManus noted in her report that "[i]n more than 90% of cases of documented sexual abuse the exam is normal." (State's Ex. 5 p. 4).

{¶ 15} In addition to a physical examination of A.C. by Dr. McManus, a rape kit was performed on A.C. by Teresa Warnimont, a SANE. Warnimont collected evidence and submitted it to BCI for testing. All swabs of A.C. checking for semen and amylase were negative. However, DNA testing revealed that in the crotch portion of A.C.'s underwear a male's DNA was present, which was consistent with a sample of Fetherolf's DNA. [FN6] The DNA analyst testified at trial that the DNA present in A.C.'s underwear was more than what she would usually find with simply touching or handling underwear.

FN6: "The partial Y–Chromosome DNA profile from the crotch and front panel of the underwear (Item 1.7.1A) is consistent with Michael Fetherolf." (State's Ex. 21). Further, the "estimated frequency 1 in every 4167 male individuals." (*Id.*)

{¶ 16} A videotaped deposition of A.C. was played for the jury.FN7 The deposition was dated May 18, 2015, which would have been approximately a year and a half after the alleged incidents of September 2013. During the deposition, A.C. often said she did not remember events. She even stated she could not remember the answers to some questions that she was asked that were totally unrelated to the events in question. [FN8] A.C. was tearful in the deposition and appeared reluctant to testify at all. At one point the deposition was stopped because A.C. was crying and she wanted to see her mother. When the deposition resumed, A.C. said she had gotten scared. In fact, on multiple occasions A.C. indicated that she was scared, and she stated that she did not want to talk about Fetherolf because she was scared. The

one emphatic thing A.C. did testify to was that she did not want to see Fetherolf. [FN9]

FN7: The parties stipulated that A.C. was unavailable to testify at trial.

FN8: At the beginning of the deposition, the judge presiding over the deposition indicated that he had found A.C. competent to testify.

FN9: Through most of the deposition, A.C. was quiet and reluctant to say anything, answering most questions with some variation of "I can't remember." However, she was very definite in stating that she did not want to see Fetherolf. She was much louder and emphatic. Heather also testified that since the incident A.C. wanted nothing to do with her father.

{¶ 17} A.C. never did give an account of what Fetherolf had allegedly done to her in her deposition. When asked what occurred on the September 2013 weekend in question, she stated that she could not remember. However, when she was asked if she thought she had told people what had happened to her, she stated that she "thought so." Separately in the deposition she stated that she told her Aunt Kara "what [her] dad did," but she never defined what that was.

{¶ 18} Dennis Flanagan, a detective with the City of Marysville testified as to his involvement with this case. He testified that he tried to contact Fetherolf shortly after the accusations were made to get his side of the story and Fetherolf called Detective Flanagan one night just after midnight. Detective Flanagan testified that Fetherolf sounded irate and intoxicated. Detective Flanagan testified that Fetherolf called the allegations against him "bullshit" and stated that he would come in for an interview. Detective Flanagan testified that Fetherolf never came in and that Detective Flanagan was eventually contacted months later and informed that Fetherolf was apprehended elsewhere.

{¶ 19} The State also presented the testimony of Fetherolf's probation officer and a paramour of Fetherolf's, Pam Hawkins. Hawkins testified that she left her husband to be with Fetherolf in the fall of 2013, around the time these allegations surfaced. Hawkins testified that she thought Fetherolf was on felony probation for failure to pay child support[FN10] and that she and Fetherolf left Ohio together, at Fetherolf's suggestion, to go to New York and Pennsylvania. Hawkins testified that one evening while with Fetherolf she saw him looking at inappropriate pictures of underage girls on a tablet. She also testified that Fetherolf purchased her a wig, thong and a skirt to dress her up like a "little girl." (March 8, 2016, Tr. at 137).

FN10: Any child support related accusations were not regarding A.C. They involved another child or other children.

{¶ 20} Hawkins testified that things soured between her and Fetherolf and she turned herself in for an outstanding warrant. Hawkins testified that she went to jail

and when she got out she alerted officers to Fetherolf's location. At that time, she believed he had an active warrant related to failure to pay child support.

{¶ 21} At the conclusion of the State's case, Fetherolf's counsel made a Crim.R. 29 motion for acquittal on all counts. The trial court sustained that motion with regard to 30 counts of the superseding indictment. Specifically, the trial court dismissed counts 3–32 of the superseding indictment on the basis that there was insufficient evidence to support convictions for Rape or GSI for any instances other than the September 2013 instance after which A.C. promptly disclosed what happened. The trial court indicated that the other allegations related to incidents that purportedly occurred between 2011 and 2013 were too indefinite and lacked sufficient proof to submit to the jury.

{¶ 22} The remaining three counts against Fetherolf, Rape, Gross Sexual Imposition, and Intimidation of a Witness related to the September 2013 incident, were then submitted to the jury. The jury ultimately found Fetherolf guilty of all three counts.

{¶ 23} Prior to Fetherolf's sentencing, he filed multiple pro se motions including a motion for a new trial, which alleged, *inter alia*, that the State failed to disclose some prior convictions of one of its witnesses, Pamela Hawkins. At Fetherolf's sentencing hearing, the trial court overruled Fetherolf's new trial motion, with the exception of his argument that the State failed to disclose some of the prior convictions of Hawkins. The trial court indicated that it would allow the State to respond in writing to Fetherolf's contention and that the trial court would rule on that issue related to Fetherolf's motion for a new trial after it received the State's response.

{¶ 24} As to Fetherolf's sentencing, the trial court merged Fetherolf's convictions for Rape and Gross Sexual Imposition, finding that they were allied offenses of similar import, and the State elected to proceed to sentence Fetherolf on the Rape conviction. The trial court then ordered Fetherolf to serve 25 years to life in prison on the Rape conviction, of which 25 years was a mandatory prison term. Fetherolf was sentenced to serve 30 months in prison on the Intimidation of a Witness conviction, concurrent to the Rape sentence.

{¶ 25} On April 6, 2016, a judgment entry memorializing Fetherolf's sentence was filed. Fetherolf filed a notice of appeal from that judgment.

{¶ 26} On April 21, 2016, the State filed a memorandum in opposition to Fetherolf's motion for a new trial based on the State allegedly failing to disclose prior convictions of Hawkins. Fetherolf then filed a pro se response. On May 24, 2016, the trial court filed an entry denying Fetherolf's motion for a new trial. Fetherolf filed a notice of appeal from that judgment.

{¶ 27} Fetherolf's appeals from his sentencing entry and from the denial of his motion for a new trial were consolidated, and he asserts the following assignments of error for our review.

Assignment of Error No. 1

The trial court erred when it allowed Dr. McManus, S.A.N.E. nurse Teresa Warnimont, and Caseworker Kaitlin Ruddy to testify to the veracity of A.C.'s statements.

Assignment of Error No. 2

The trial court erred when it failed to exclude: (1) details of Mr. Fetherolf's prior conviction and sentence when he did not testify at trial, and (2) other acts evidence which had no bearing on any fact of consequence in contravention of Evid.R. 404(B)[.]

Assignment of Error No. 3

The trial court erred when it denied Mr. Fetherolf a new trial after the State failed to turn over to defense counsel all of Pamela Hawkins' prior convictions, including a recent conviction for falsification.

Assignment of Error No. 4

Michael Fetherolf's right to a fair trial was violated by repeated instances of prosecutorial misconduct and deprived Mr. Fetherolf of a fair trial.

*State v. Fetherolf*, 3rd Dist. Nos. 14-16-10, 14-16-11, 2017 WL 1316207, at *1-5 (Ohio Ct. App. April 10, 2017). On April 10, 2017, the appellate court affirmed the judgment of the trial court. On December 6, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Fetherolf,* 151 Ohio St.3d 1458 (Ohio 2017). On February 14, 2018, the Ohio Supreme Court denied Petitioner's motion for reconsideration. *State v. Fetherolf*, 151 Ohio St.3d 1529 (Ohio 2018).

On April 25, 2017, Petitioner filed a state post-conviction petition in the state trial court, asserting the denial of the effective assistance of trial counsel. (ECF No. 13-1, PAGEID # 1184.) On June 7, 2017, the trial court denied that action, concluding that Petitioner's claims of the denial

of the effective assistance of trial counsel were barred by *res judicata*. (PAGEID # 1203.) Petitioner did not file an appeal.

On July 6, 2017, Petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). (PAGEID # 1207.) On August 16, 2017, the appellate court denied the Rule 26(B) application. (PAGEID # 1254.) On December 6, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal. (PAGEID # 1330.) On February 14, 2018, the Ohio Supreme Court denied Petitioner's motion for reconsideration. (PAGEID # 1339.)

On June 15, 2018, and June 25, 2018, Petitioner filed a Motion for Relief from Judgment Pursuant to Civil Rule 60(B)(5) Fraud Upon the Court. (ECF No. 13-1, PAGEID # 1340, 1382.) On August 7, 2018, he filed a Motion to Supplement 60(B)(5) Motion Fraud Upon the Court. (PAGEID # 1426.) On October 4, 2018, the trial court denied those actions as untimely post-conviction actions. (PAGEID # 1473.) Petitioner apparently did not file an appeal.

On March 1, 2019, and June 10, 2019, Petitioner filed a Motion for Leave to File a New Trial Motion and Motion for New Trial. (ECF No. 13-1, PAGEID # 1475, 1527.) On June 19, 2019, the trial court denied the motion for leave to file a motion for a new trial. (PAGEID # 1544.) Petitioner did not file an appeal. Petitioner has pursued other state court actions that do not affect resolution of this action and will not be addressed here. (*See Return of Writ*, ECF No. 14, PAGEID # 2348-49.)

On January 19, 2019, Petitioner filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He asserts that he was denied a fair trial due to admission of other bad acts evidence (claim one); that the State improperly withheld and concealed exculpatory evidence (claim two); that he was denied the right to confront the witnesses against him (claim three); that the prosecutor obtained his convictions by misrepresentation, falsification of evidence, and

perjury from prosecution witnesses (claim four); that he was denied due process and the right to an impartial jury by the presentation of false evidence, perjury and prosecutorial misconduct (claim five); that the prosecutor and expert improperly commented on the veracity of witnesses (claim six); that he was denied the effective assistance of trial counsel (claim seven); that he was denied the effective assistance of appellate counsel (claim eight); and that the trial court improperly permitted admission of "Y-STR evidence" (claim nine). It is the position of the Respondent that these claims are procedurally defaulted or without merit.

### III. Motion to Appoint Counsel

On September 3, 2019, the Court issued an Order denying Petitioner's request for the appointment of counsel. (ECF No. 36.) Petitioner has filed a motion for reconsideration of that Order, and again requesting the appointment of counsel. (ECF No. 43.) Petitioner contends that an evidentiary hearing will be required to resolve this action, because the state appellate court did not conduct a hearing on his claim of the denial of the effective assistance of appellate counsel, and because his claims cannot be resolved on the record. Petitioner again asserts that he is actually innocent of the charges against him and the victim of false testimony and misrepresentations from prosecution witnesses.

As previously discussed, however, it does not now appear that an evidentiary hearing will be required to resolve Petitioner's claims or that this case is so unduly complex that the interests of justice warrant the appointment of counsel on Petitioner's behalf. For the reasons discussed in this Court's prior Order (ECF No. 36), Petitioner's Motion for Reconsideration (ECF No. 43) is **DENIED.**

9

## IV. Discovery and Expansion of Record

Petitioner has filed a Motion to Expand the Record (ECF No. 21) to include certain facebook posts, Pam Hawkins' criminal record, a memorandum opposing the State's intent to use evidence, unidentified documents relating to the States' request for a deposition, a copy of the writ of prohibition Petitioner filed in the Ohio Court of Appeals, a lease agreement, arrest warrants, BCI reports, copies of State Exhibits 20, 21, 13, and 18, the Bill of Particulars, "C.V.'s" or copies of State Exhibits 14, 19, and 4, miscellaneous unidentified records from the Delaware County Child Support Enforcement Agency, unidentified correspondence between the petitioner and his appellate counsel, and a copy of a complaint Petitioner filed against the prosecutor, his appellate attorney, and prosecution witness Hailey Garofalo. (*Motion to Expand the Record*, ECF No. 21.) These exhibits, referred to by the Petitioner, have not been made a part of the record before this Court. Respondent opposes Petitioner's Motion to Expand the Record as not relevant. (ECF No. 26.)

Petitioner also has filed a Motion for Discovery requesting an unredacted copy of "Police report #13RO14562" in support of his claim of prosecutorial misconduct and perjury based on Detective Flannigan's testimony that statements Flannigan received from the alleged victim's family were consistent with statements he observed in the hospital record. According to the Petitioner, this testimony contradicts information contained in the police report and therefore supports his allegation that Flannigan lied and Petitioner was convicted based on perjured testimony by prosecution witnesses. Petitioner has attached a copy of the redacted report. (ECF No. 22-1, PAGEID # 2435-2448.) Respondent opposes this Motion for Discovery as precluded by *Cullen v. Pinholster*, 563 U.S. 170 (2011). (ECF No. 25.)

10

Petitioner additionally has filed a Motion for Discovery requesting a copy of the rules and procedures for evidence collection from the Ohio Bureau of Criminal Investigations. (ECF No. 27.) Petitioner argues that this material will support his claim that BCI analyst David Ross improperly collected evidence resulting in cross-contamination, as Ross used only one swab to collect evidence from different areas of the alleged victim's underwear. (PAGEID # 2464-65.) Respondent again opposes this request. (ECF No. 29.)

Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts authorizes a court to expand the record under certain circumstances:

> (a) In General. If the petition is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the petition. The judge may require that these materials be authenticated.
>
> (b) Types of Materials. The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record.
>
> (c) Review by the Opposing Party. The judge must give the party against whom the additional materials are offered an opportunity to admit or deny their correctness.

The purpose of this rule is not only to enable the court to consider the merits of claims without an evidentiary hearing, but also to assist the court in determining whether an evidentiary hearing is warranted. *Blackledge v. Allison*, 431 U.S. 63, 81 (1977).

The discovery processes contained in the Federal Rules of Civil Procedure do not automatically apply in habeas corpus actions. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). In *Harris v. Nelson*, 394 U.S. 286, 295 (1969), the United States Supreme Court held that the "broad discovery provisions" of the Federal Rules of Civil Procedure do not apply in habeas corpus proceedings. As a result of the holding in *Harris*,

11

Congress promulgated the Rules Governing Section 2254 Cases in United States District Courts in 1976. Specifically, Rule 6(a) provides:

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his or her discretion and for good cause shown grants leave to do so, but not otherwise.

Under this "good cause" standard, a district court should grant leave to conduct discovery in habeas corpus proceedings only "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that he is . . . entitled to relief. . . .'" *Bracy*, 520 U.S. at 908-909 (quoting *Harris*, 394 U.S. at 300); *see also Williams v. Bagley*, 380 F.3d 932, 974-75 (6th Cir. 2004); *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). In keeping with the well-settled principle that habeas petitioners are not entitled to go on fishing expeditions in search of damaging evidence, this "good cause" standard requires the petitioner to at least attempt to identify what he expects to uncover through his discovery requests. *See Williams v. Bagley*, 380 F.3d at 976.

Another factor to consider in determining whether discovery is warranted is the inescapable impact of *Cullen v. Pinholster*, 563 U.S. 170 (2011). *See Johnson v. Bobby*, No. 2:08-cv-55, 2018 WL 1382455, at *7 (S.D. Ohio March 19, 2018). In *Pinholster*, the Supreme Court held that federal review under 28 U.S.C. § 2254(d) of a claim adjudicated on the merits by a state court is limited to the factual record that was before the state court. The Court of Appeals for the Sixth Circuit consistently has held that *Pinholster* precludes consideration of new evidence developed in habeas corpus as to claims that the state courts adjudicated on the merits, and federal courts increasingly have concluded that *Pinholster's* impact should be considered when determining whether discovery is warranted. *Id.* (citing *Loza v. Mitchell*, 766 F.3d 466, 494 (6th Cir. 2014); *Moore v. Mitchell*, 708 F.3d 760, 780-84 (6th Cir. 2013) (other citations

omitted); *see also Dunlap v. Paskett*, No. 1:99-cv-559, 2019 WL 1274862, at *8 (S.D. Ohio March 20, 2019) ("District courts within the Sixth Circuit have even denied requests to conduct discovery on the basis of *Pinholster*.") (citations omitted); *Graggs v. Warden, Lebanon Correctional Inst.*, No. 2:12-cv-190, 2013 WL 2404076, at *18 (S.D. Ohio May 30, 2013) (citing *Caudill v. Conover*, 871 F. Supp. 2d 639, 646 (E.D.Ky. May 14, 2012) ("It would defy logic to preclude a petitioner from developing factual information in an evidentiary hearing [under *Pinholst*er], but allow her to introduce the same factual information via discovery and expansion of the record").

Petitioner does not indicate, and the record does not reflect, the manner in which the various exhibits he refers to, *i.e.*, Facebook posts, Pam Hawkins' criminal record, a memorandum opposing the State's intent to use evidence, unidentified documents relating to the States' request for a deposition, a copy of the writ of prohibition Petitioner filed in the Ohio Court of Appeals, a lease agreement, arrest warrants, BCI reports, copies of State Exhibits 20, 21, 13, and 18, the Bill of Particulars, "C.V.'s" or copies of State Exhibits 14, 19, and 4, miscellaneous unidentified records from the Delaware County Child Support Enforcement Agency, unidentified correspondence between the petitioner and his appellate counsel, and a copy of a complaint Petitioner filed against the prosecutor, his appellate attorney, and prosecution witness Hailey Garofalo, will assist him in establishing his claims. He has failed to establish good cause for this discovery request. Moreover, Petitioner appears to have withdrawn this request. (*See Sur-Reply to Motion to Expand the Record*, ECF No. 33; *see also Reply to Response to Motion* to *Expand the Record*, ECF No. 31 PAGEID # 2479, acknowledging that none of the requested exhibits support his claims, and withdrawing his requests except as to "Exhibit I, which is also State['s] Exhibit 13, 18, 20, and 21.")

Additionally, expansion of the record to include a copy of the rules and procedures for evidence collection from the Ohio Bureau of Criminal Investigations likewise will not assist Petitioner. Ross testified that he collected two swabs from the alleged victim's underwear. (*Transcript,* ECF No. 13-4, PAGEID # 2142, 2144-45.) Ross did not perform any DNA analysis. (PAGEID # 2148.) Hallie Garofalo conducted the DNA testing of the swabs Ross collected, including Item 1.7.1-A, a swab taken from the crotch and front panel of the alleged victim's underwear, and Item 1.7.1-B, a swab taken from the waistband of the underwear. (*Transcript*, ECF No. 13-4, PAGEID # 2154.) The partial Y chromosome DNA profile obtained from Item 1.7.1-A was consistent with that of the Petitioner, the estimated frequency being one in 4, 167 male individuals. (PAGEID # 2162.) It was Garofalo's opinion, based on the amount of DNA detected, that it had not resulted from a casual touch. (PAGEID # 2164.) Thus, Petitioner's argument that Ross should have used two swabs to collect the DNA evidence obtained from the crotch and front panel of the alleged victim's underwear would not assist him in establishing that his DNA was not present.

Petitioner argues that an unredacted copy of Flannigan's police report, which he presumably obtained in discovery, will show that Flannigan lied when Flannigan testified that witness statements he received were consistent with statements he obtained from hospital records. However, Flannigan testified in relevant part as follows:

> [A]fter I obtained the information from the hospital, I compared that information to what I had obtained from the interviews. Found that [the victim's] statements were very consistent and this consistency was spread over a wide variety of individuals that she had spoken to in a relatively short period of time. At that point, I really felt it was imperative since I had already spoken to her mother that I locate her biological father, Michael Fetheroff, who was the alleged suspect.

(*Transcript,* ECF No. 13-4, PAGEID # 2078-79.) Thus, and contrary to Petitioner's allegations here, Flannigan did not testify that witness statements were inconsistent or consistent with reports

14

he obtained from the hospital.  Petitioner has failed to establish good cause for his request for an unredacted copy of Officer Flannigan's police report.

Petitioner's Motion to Expand the Record, Motions for Discovery, and Motion for Reconsideration on the Motion to Appoint Counsel, ECF Nos. 21, 22, 27, 43, are **DENIED**.

**IT IS SO ORDERED**.

                                            _s/ *Elizabeth A. Preston Deavers*
                                            Elizabeth A. Preston Deavers
                                            Chief United States Magistrate Judge