# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MICHAEL FETHEROLF,

    Petitioner,

    v.

WARDEN, CHILLICOTHE
CORRECTIONAL INSTITUTION,

    Respondent.

CASE NO. 2:19-cv-00168
Judge Edmund A. Sargus, Jr.
Chief Magistrate Judge Elizabeth P. Deavers

## ORDER and
## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition and Merit Brief in Support, Respondent's Return of Writ, Petitioner's Reply and Notice of State Court Exhaustion, and the exhibits of the parties. For the reasons that follow, the undersigned **RECOMMENDS** that this action be **DISMISSED**.

Petitioner's Motion to Amend and Stay (ECF No. 53) is **DENIED.**

Petitioner's Motion for Nonpublication of Documents and Motion for Evidentiary Hearing (ECF Nos. 59, 60) are **DENIED**.

## I. Facts and Procedural History

Petitioner challenges his convictions after a jury trial in the Union County Court of Common Pleas on charges of rape and intimidation of a witness. The Ohio Third District Court of Appeals summarized the facts and procedural history of the case as follows:

> {¶ 3} On January 23, 2015, a superseding indictment was filed against Fetherolf. The superseding indictment alleged 33 counts against Fetherolf, beginning with the same allegation of Rape previously indicted (Count 1) and the same allegation of Gross Sexual Imposition previously indicted (Count 2). The superseding indictment

then also alleged fifteen counts of Rape in violation of R.C. 2907.02(A)(1)(b), all felonies of the first degree (Counts 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31), fifteen counts of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), all felonies of the third degree (Counts 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32), and one count of Intimidation of an Attorney, Victim or Witness in a Criminal Case in violation of R.C. 2921.04(B), a felony of the third degree (Count 33). The new Rape and Gross Sexual Imposition charges were related to similar allegations of digital penetration that Fetherolf allegedly perpetrated against A.C. when Fetherolf had physical custody of A.C. on weekends between March of 2011 and September of 2013. The Intimidation of a Witness charge alleged that Fetherolf threatened to spank A.C. if she told anyone about the alleged incidents, and that she would be in trouble if she told anyone. Fetherolf pled not guilty to the charges.

{¶ 4} On March 7–10, 2016, a jury trial was held. [FN]2 Testimony at trial indicated that A.C. was born in March of 2006 to mother Heather C., but it was not determined that Fetherolf was A.C.'s father until a DNA test was done when A.C. was approximately two and a half years old. After Fetherolf was determined to be A.C.'s father, Heather testified that she contacted Fetherolf and asked if he wanted to be involved in A.C.'s life. Fetherolf indicated that he did and Heather began providing Fetherolf with visitation. [FN]3 Heather testified that as time passed she started allowing overnight visits between A.C. and Fetherolf and that those overnight visits grew into every other weekend.

FN2: A visiting judge presided over the trial.

FN3: Heather testified that all visitation was established outside of court proceedings.

{¶ 5} Heather testified that on Friday September 20, 2013, she dropped A.C. off with Fetherolf for his weekend visitation with the intent being that Fetherolf or his grandmother would return A.C. on Sunday. Testimony indicated that Fetherolf was staying in his grandmother's trailer at the time and that he primarily exercised his visitation with A.C. at the trailer.

{¶ 6} Heather indicated that she was contacted by Fetherolf on Saturday September 21st and Fetherolf asked her to drop off extra clothes for A.C., which she did. Then, Heather testified that she received a text message from Fetherolf on Sunday September 22, 2013, stating that his grandmother would bring A.C. home on Monday morning instead of Sunday. On Monday morning, Heather testified that she received a message from Fetherolf wherein he stated that he woke up late and that he or his grandmother would bring A.C. home that night or take her directly to school on Tuesday, September 24, 2013. Heather testified that she was upset with the situation.

{¶ 7} Heather indicated that the next morning, Tuesday, she received a call from the school inquiring about A.C. because she was not at school. Heather then began

trying to contact Fetherolf. Heather testified that when she could not get in contact with Fetherolf, she called the police. The police located Fetherolf that day and facilitated A.C.'s return to Heather.

{¶ 8} After A.C. was returned to her, Heather took A.C. home. Heather commented that A.C. was dirty and looked like she needed a bath. Heather indicated that it was around lunchtime and A.C. was hungry so Heather made her food. Heather testified that A.C. looked "down" but was responsive. Heather testified that she asked A.C. about her weekend and eventually asked if A.C. got in trouble at Fetherolf's. Heather testified that A.C. put her head down, which was unusual behavior for A.C.

{¶ 9} Heather testified that A.C. asked to take her lunch upstairs to her room. Heather indicated that it was fine and permitted A.C. to go upstairs. Heather testified that shortly thereafter, Heather's sister Kara went upstairs to talk to A.C. and a few minutes later Kara came down, "pale" with "a look of shock" and said that Heather needed to talk to A.C. (March 7, 2016, Tr. at 196).

{¶ 10} Heather testified that she then talked to her daughter and asked what was wrong repeatedly and Heather testified that A.C. initially told her that she did not want to say anything because she was afraid of being spanked or getting in trouble. Heather testified that she conveyed to A.C. that she was not going to get into trouble and that A.C. then told her that Fetherolf touched her "in her butterfly," and indicated her vagina. (*Id*. at 197). Heather testified that she asked A.C. what she meant and A.C. demonstrated with her hand.

> She put her palm up. She took two fingers up and started going up and down like this on her palm and then she stuck one finger inside of her palm. And I asked her what she meant by that and she said that he had stuck a finger inside of her.

(*Id*.) Heather testified that A.C. also told her that Fetherolf threatened to spank A.C. if A.C. did not allow him to touch her "butterfly." (March 7, 2016, Tr. at 197). Heather testified that A.C. indicated that similar acts had been going on since A.C. was between four and five years old. Kara, who had already talked to A.C. at that point, testified that A.C. had told her essentially the same story, that Fetherolf touched her in her "no-no" parts, indicating her vaginal area. (March 8, 2016, Tr. at 16).

{¶ 11} Heather testified that after hearing A.C.'s story she was upset and she went downstairs to make some phone calls. Kara took A.C. to a nearby park for 20–30 minutes while Heather made the calls. Heather testified that she called her mother, Linda, who came to the house. Linda also spoke with A.C. and Linda testified that A.C. revealed to her that Fetherolf had "stuck his fingers up in [her]" and that it had been going on since A.C. was four or five years old. (*Id*. at 43). According to Linda, A.C. also said that she did not tell anyone because her father had threatened to spank her if she did. [FN]4

FN4: Fetherolf's attorney objected to testimony related to A.C.'s disclosures to Heather, Kara, and Linda. The trial court overruled these objections stating that they were, inter alia, excited utterances. Fetherolf does not claim on appeal that it was error for the trial court to permit these particular statements.

{¶ 12} After Heather finished making phone calls to, inter alia, her pediatrician, A.C. was taken to a nearby hospital and referred to a separate hospital that could more adequately handle a sexual assault examination. A.C. was then taken to the emergency room at Nationwide Children's Hospital by Heather, Kara, and Kara's boyfriend.

{¶ 13} At the emergency room, A.C. met with a number of medical professionals including an emergency room physician and a Sexual Assault Nurse Examiner ("SANE"). A.C. also met with a social worker, Lauren Kato, who took A.C.'s initial history. A.C. informed the social worker and medical personnel that Fetherolf had been drinking and had "swirl[ed]" his fingers on her "bad spot." (March 8, 2016, Tr. at 109). Kato testified that A.C. indicated that Fetherolf threatened to spank A.C. if she did not cooperate. Kato testified that A.C.'s disclosure was consistent with what A.C. had told her mother based on Kato's interview with Heather.

{¶ 14} Shortly thereafter on the same date, A.C. was physically examined by Dr. Helen McManus, an emergency room physician. Dr. McManus testified that she used the initial history provided by Kato to direct her care. Dr. McManus testified that although she did not find any marks on A.C. the exam was consistent with an allegation of touching, which would often not leave any marks. [FN]5 Dr. McManus testified that following her examination she concluded that A.C. had been sexually abused.

FN5: Dr. McManus noted in her report that "[i]n more than 90% of cases of documented sexual abuse the exam is normal." (State's Ex. 5 p. 4).

{¶ 15} In addition to a physical examination of A.C. by Dr. McManus, a rape kit was performed on A.C. by Teresa Warnimont, a SANE. Warnimont collected evidence and submitted it to BCI for testing. All swabs of A.C. checking for semen and amylase were negative. However, DNA testing revealed that in the crotch portion of A.C.'s underwear a male's DNA was present, which was consistent with a sample of Fetherolf's DNA. [FN]6 The DNA analyst testified at trial that the DNA present in A.C.'s underwear was more than what she would usually find with simply touching or handling underwear.

FN6: "The partial Y–Chromosome DNA profile from the crotch and front panel of the underwear (Item 1.7.1A) is consistent with Michael Fetherolf." (State's Ex. 21). Further, the "estimated frequency 1 in every 4167 male individuals." (*Id.*)

{¶ 16} A videotaped deposition of A.C. was played for the jury.  [FN]7 The deposition was dated May 18, 2015, which would have been approximately a year and a half after the alleged incidents of September 2013. During the deposition, A.C. often said she did not remember events. She even stated she could not remember the answers to some questions that she was asked that were totally unrelated to the events in question.  [FN]8 A.C. was tearful in the deposition and appeared reluctant to testify at all. At one point the deposition was stopped because A.C. was crying and she wanted to see her mother. When the deposition resumed, A.C. said she had gotten scared. In fact, on multiple occasions A.C. indicated that she was scared, and she stated that she did not want to talk about Fetherolf because she was scared. The one emphatic thing A.C. did testify to was that she did not want to see Fetherolf.  [FN]9

FN7:  The parties stipulated that A.C. was unavailable to testify at trial.

FN8:  At the beginning of the deposition, the judge presiding over the deposition indicated that he had found A.C. competent to testify.

FN9:  Through most of the deposition, A.C. was quiet and reluctant to say anything, answering most questions with some variation of "I can't remember."  However, she was very definite in stating that she did not want to see Fetherolf.  She was much louder and emphatic.  Heather also testified that since the incident A.C. wanted nothing to do with her father.

{¶ 17} A.C. never did give an account of what Fetherolf had allegedly done to her in her deposition. When asked what occurred on the September 2013 weekend in question, she stated that she could not remember. However, when she was asked if she thought she had told people what had happened to her, she stated that she "thought so." Separately in the deposition she stated that she told her Aunt Kara "what [her] dad did," but she never defined what that was.

{¶ 18} Dennis Flanagan, a detective with the City of Marysville testified as to his involvement with this case. He testified that he tried to contact Fetherolf shortly after the accusations were made to get his side of the story and Fetherolf called Detective Flanagan one night just after midnight. Detective Flanagan testified that Fetherolf sounded irate and intoxicated. Detective Flanagan testified that Fetherolf called the allegations against him "bullshit" and stated that he would come in for an interview. Detective Flanagan testified that Fetherolf never came in and that Detective Flanagan was eventually contacted months later and informed that Fetherolf was apprehended elsewhere.

{¶ 19} The State also presented the testimony of Fetherolf's probation officer and a paramour of Fetherolf's, Pam Hawkins. Hawkins testified that she left her husband to be with Fetherolf in the fall of 2013, around the time these allegations surfaced. Hawkins testified that she thought Fetherolf was on felony probation for failure to pay child supportFN10 and that she and Fetherolf left Ohio together, at

Fetherolf's suggestion, to go to New York and Pennsylvania. Hawkins testified that one evening while with Fetherolf she saw him looking at inappropriate pictures of underage girls on a tablet. She also testified that Fetherolf purchased her a wig, thong and a skirt to dress her up like a "little girl." (March 8, 2016, Tr. at 137).

FN10: Any child support related accusations were not regarding A.C. They involved another child or other children.

{¶ 20} Hawkins testified that things soured between her and Fetherolf and she turned herself in for an outstanding warrant. Hawkins testified that she went to jail and when she got out she alerted officers to Fetherolf's location. At that time, she believed he had an active warrant related to failure to pay child support.

{¶ 21} At the conclusion of the State's case, Fetherolf's counsel made a Crim.R. 29 motion for acquittal on all counts. The trial court sustained that motion with regard to 30 counts of the superseding indictment. Specifically, the trial court dismissed counts 3–32 of the superseding indictment on the basis that there was insufficient evidence to support convictions for Rape or GSI for any instances other than the September 2013 instance after which A.C. promptly disclosed what happened. The trial court indicated that the other allegations related to incidents that purportedly occurred between 2011 and 2013 were too indefinite and lacked sufficient proof to submit to the jury.

{¶ 22} The remaining three counts against Fetherolf, Rape, Gross Sexual Imposition, and Intimidation of a Witness related to the September 2013 incident, were then submitted to the jury. The jury ultimately found Fetherolf guilty of all three counts.

{¶ 23} Prior to Fetherolf's sentencing, he filed multiple pro se motions including a motion for a new trial, which alleged, *inter alia*, that the State failed to disclose some prior convictions of one of its witnesses, Pamela Hawkins. At Fetherolf's sentencing hearing, the trial court overruled Fetherolf's new trial motion, with the exception of his argument that the State failed to disclose some of the prior convictions of Hawkins. The trial court indicated that it would allow the State to respond in writing to Fetherolf's contention and that the trial court would rule on that issue related to Fetherolf's motion for a new trial after it received the State's response.

{¶ 24} As to Fetherolf's sentencing, the trial court merged Fetherolf's convictions for Rape and Gross Sexual Imposition, finding that they were allied offenses of similar import, and the State elected to proceed to sentence Fetherolf on the Rape conviction. The trial court then ordered Fetherolf to serve 25 years to life in prison on the Rape conviction, of which 25 years was a mandatory prison term. Fetherolf was sentenced to serve 30 months in prison on the Intimidation of a Witness conviction, concurrent to the Rape sentence.

{¶ 25} On April 6, 2016, a judgment entry memorializing Fetherolf's sentence was filed. Fetherolf filed a notice of appeal from that judgment.

{¶ 26} On April 21, 2016, the State filed a memorandum in opposition to Fetherolf's motion for a new trial based on the State allegedly failing to disclose prior convictions of Hawkins. Fetherolf then filed a pro se response. On May 24, 2016, the trial court filed an entry denying Fetherolf's motion for a new trial. Fetherolf filed a notice of appeal from that judgment.

{¶ 27} Fetherolf's appeals from his sentencing entry and from the denial of his motion for a new trial were consolidated, and he asserts the following assignments of error for our review.

Assignment of Error No. 1

The trial court erred when it allowed Dr. McManus, S.A.N.E. nurse Teresa Warnimont, and Caseworker Kaitlin Ruddy to testify to the veracity of A.C.'s statements.

Assignment of Error No. 2

The trial court erred when it failed to exclude: (1) details of Mr. Fetherolf's prior conviction and sentence when he did not testify at trial, and (2) other acts evidence which had no bearing on any fact of consequence in contravention of Evid.R. 404(B)[.]

Assignment of Error No. 3

The trial court erred when it denied Mr. Fetherolf a new trial after the State failed to turn over to defense counsel all of Pamela Hawkins' prior convictions, including a recent conviction for falsification.

Assignment of Error No. 4

Michael Fetherolf's right to a fair trial was violated by repeated instances of prosecutorial misconduct and deprived Mr. Fetherolf of a fair trial.

*State v. Fetherolf*, 3rd Dist. Nos. 14-16-10, 14-16-11, 2017 WL 1316207, at *1-5 (Ohio Ct. App. April 10, 2017). On April 10, 2017, the appellate court affirmed the judgment of the trial court.

On December 6, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Fetherolf,* 151 Ohio St.3d 1458 (Ohio 2017). On February 14, 2018, the Ohio Supreme Court

denied Petitioner's motion for reconsideration. *State v. Fetherolf*, 151 Ohio St.3d 1529 (Ohio 2018).

On April 25, 2017, Petitioner filed a post-conviction petition in the state trial court, asserting the denial of the effective assistance of trial counsel. (ECF No. 13-1, PAGEID # 1184.) On June 7, 2017, the trial court denied that action, concluding that Petitioner's claims of ineffective assistance of trial counsel were barred by *res judicata*. (PAGEID # 1203.) Petitioner did not file an appeal.

On July 6, 2017, Petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). (PAGEID # 1207.) On August 16, 2017, the appellate court denied the Rule 26(B) application. (PAGEID # 1254.) On December 6, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal. (PAGEID # 1330.) On February 14, 2018, the Ohio Supreme Court denied Petitioner's motion for reconsideration. (PAGEID # 1339.)

On June 15, 2018, and June 25, 2018, Petitioner filed a Motion for Relief from Judgment Pursuant to Civil Rule 60(B)(5) Fraud Upon the Court. (ECF No. 13-1, PAGEID # 1340, 1382.) On August 7, 2018, he filed a Motion to Supplement 60(B)(5) Motion Fraud Upon the Court. (PAGEID # 1426.) On October 4, 2018, the trial court denied those actions as untimely post-conviction actions. (PAGEID # 1473.) Petitioner apparently did not file an appeal.

On March 1, 2019, and June 10, 2019, Petitioner filed a Motion for Leave to File a New Trial Motion and Motion for New Trial. (ECF No. 13-1, PAGEID # 1475, 1527.)[1] On June 19,

---

[1] Petitioner argued that he had new evidence establishing that the prosecutor made false and improper statements regarding DNA evidence and that he was denied the effective assistance of counsel due to his attorney's failure to obtain a defense expert on DNA evidence. (ECF No. 13-1, PAGEID # 1478-84.) He submitted a letter from Dr. Theodore D. Kessis dated February 18, 2019 in support, indicating as follows:

> It appears that the Bureau of Criminal Investigation (BCI) collected and tested a variety of evidentiary items in connection with a sexual assault case against you. Serology testing of the evidence included in the rape kit taken from [A.C.] did not demonstrate the presence of either semen,

2019, the trial court denied the motion for leave to file a motion for a new trial. (PAGEID #

1544.) On October 28, 2019, the appellate court affirmed the judgment of the trial court holding

that Petitioner had failed to present any new evidence and that the action was barred under

Ohio's doctrine of *res judicata*. (*Judgment Entry*, ECF No. 54-1.) On January 21, 2020, the

Ohio Supreme Court declined to accept jurisdiction of the appeal. (ECF No. 66-1, PAGEID #

3600.)

Petitioner also has pursued other state court action that does not affect resolution of this

action and will not be addressed here. (*See Return of Writ*, ECF No. 14, PAGEID # 2348.)

On January 19, 2019, Petitioner filed this petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254. He asserts that he was denied a fair trial due to admission of other bad acts

evidence (claim one); that the State improperly withheld and concealed exculpatory evidence

(claim two); that he was denied the right to confront the witnesses against him (claim three); that

the prosecutor obtained his convictions by misrepresentation, falsification of evidence, and

---

sperm, blood, or saliva on any of the items tested. DNA testing by BCI demonstrated the presence
of a male ySTR DNA profile consistent with the DNA profile possessed by you.

With respect to the significance of BCI's testing results, it[] should first be noted that the lab's
negative serologic results indicate that the failed to identify the biologic source of the DNA profile
they report as being consiste[nt] with that possessed by you. Given the small amount of DNA
detected and the absence of an established biologic source such as semen, blood or saliva, it is
possible that the ySTR profile detected by the lab may have come to be deposited on the underwear
via a casual or innocent DNA transfers event.

It's also important to [] point out that while the DNA profile reported is consistent with yours, it is
also shared by approximately 1 in 4,167 males, in addition to any male relative paternally related to
you.

Last, I would note that in the absence of knowing the biological source of the DNA detect (semen,
saliva, blood etc…..) a DNA test alone tell[s] one very little with respect to how the DNA was
deposited, where the item was when the DNA was deposited, or when the DNA was deposited.

Beyond the two laboratory reports and some case notes I have received to date, the absence of
additional documents to review makes it difficult for me to comment beyond what I have stated
here. To do so I would need the full laboratory case file associated with the testing in the case.

(ECF No. 13-1, PAGEID # 1487-88.)

submission of perjured testimony from prosecution witnesses (claim four); that he was denied

due process and the right to an impartial jury by the presentation of false evidence, perjury and

prosecutorial misconduct (claim five); that the prosecutor and expert improperly commented on

the veracity of witnesses (claim six); that he was denied the effective assistance of trial counsel

(claim seven); that he was denied the effective assistance of appellate counsel (claim eight); and

that the trial court improperly permitted admission of DNA evidence (claim nine).  It is the

position of the Respondent that Petitioner's claims are procedurally defaulted or without merit.

## II.  Motion to Amend and Stay Petition

Petitioner has filed a motion to amend the Petition pursuant to Rule 15(a) of the Federal

Rules of Civil Procedure to add new claim(s) based on the purported discovery of new evidence

and claims he presented these claims in his March 1, 2019 and June 10, 2019, motion for a new

trial.  Petitioner has attached a copy of the proposed Amended Petition (ECF No. 53-7, PAGEID

# 2783) and requests a stay of proceedings pending resolution of his pending appeal in the Ohio

Supreme Court.  Petitioner's request for a stay is now moot, as he has since filed a Notice of

State Court Exhaustion Requirements (ECF No. 66), and the record does not indicate that he has

any remaining unexhausted claims for relief.  Petitioner also has attached various documents

from the state record in support, including responses by the State to Petitioner's discovery

request, a copy of Face Book posts on the account of Pamela Sue Hawkins Breece, a treatment

summary on the alleged victim from Mid Ohio Psychological Services, a copy of the laboratory

reports related to DNA testing in the case, and a letter dated February 18, 2019, from Dr.

Theodore D. Kessis responding to Petitioner's request for an expert opinion on the DNA testing.

In response to the Respondent's opposition to the motion to amend, on December 2, 2019,

Petitioner submitted yet a new proposed Amended Petition (ECF No. 56) and Amended Merits

Brief, in lieu of that he previously filed.  (ECF No. 56-3.)  In that filing, Petitioner clarifies that

he seeks to amend the petition to assert the following claims:  The trial court abused its

discretion and denied Petitioner due process by failing to hold a hearing on Petitioner's motion

for a new trial and denying the motion for a new trial based on new opinion evidence rebutting

the false and misleading evidence presented by the State's expert (claim nine); and Petitioner

was denied due process and the effective assistance of appellate counsel based on his attorney's

failure to presented meritorious claims requested by Petitioner, the misstatement of expert

testimony, falsification of testimony, and waiving oral argument (claim ten).  (ECF No. 56-3,

PAGEID # 3318.)  As discussed, Respondent opposes Petitioner's requests, arguing, *inter alia*,

that Petitioner has not acted in good faith and a stay of proceedings would not be not appropriate.

(ECF No. 55.)

Rule 15 of the Federal Rules of Civil Procedure governs motions to amend in § 2254

proceedings.  *See Rose v. Warden, Chillicothe Corr. Inst.*, No. 1:15-cv-353, 2018 WL 1425971,

at *4 (S.D. Ohio March 22, 2018) (citing 28 U.S.C. § 2242; Rule 12 of the Rules Governing

Section 2254 Cases).  Under the provision of Rule 15(a)(2), where the opposing party objects to

the amendment, "[t]he court should freely give leave when justice so requires."  The Sixth

Circuit has explained:

> Under Rule 15(a), leave to amend a pleading shall be freely given when justice so
> requires. This court has explained the factors that a district court should consider
> when deciding whether to grant leave to amend. Several elements may be
> considered in determining whether to permit an amendment. Undue delay in filing,
> lack of notice to the opposing party, bad faith by the moving party, repeated failure
> to cure deficiencies by previous amendments, undue prejudice to the opposing
> party, and futility of amendment are all factors which may affect the decision. Delay
> by itself is not sufficient reason to deny a motion to amend. Notice and substantial
> prejudice to the opposing party are critical factors in determining whether an
> amendment should be granted.

*Coe v. Bell*, 161 F.3d 320, 341–42 (6th Cir.1998) (quoting *Brooks v. Celeste*, 39 F.3d 125, 130 (6th Cir. 1994)).

Petitioner's proposed new claim(s), however, plainly fail to provide him a basis for relief and would be futile.

The trial court denied Petitioner's motion for a new trial as untimely and without merit, finding that Kessis' letter did not support Petitioner's claims of prosecutorial misconduct or ineffective assistance of counsel.[2] This Court agrees with that determination. The appellate court affirmed the trial court's judgment, finding that Kessis' statement did not constitute new evidence, because Petitioner knew about the DNA evidence prior to trial and had raised arguments related to the DNA evidence in his prior motion for a new trial, petition for post-conviction relief, and motions for relief from judgment. The appellate court denied Petitioner's claim ineffective assistance of counsel as barred under Ohio's doctrine of *res judicata*.

(*Judgment Entry*, ECF No. 53-8, PAGEID # 2950-51.)

> That Fetherolf avers Dr. Kessis's affidavit is a new analysis of [] DNA evidence does not transform the DNA evidence into new evidence. Accordingly, because Fetherolf brought or could have brought his arguments in his direct appeal or in other prior post-conviction motions, Fetherolf is barred by the doctrine of *res*

---

[2] The trial court held as follows:

> [A]ssuming. . . that Defendant was unavoidably prevented from discovery of Exhibit A, and accepts Exhibit A as newly discovered evidence, the Defendant has failed to show the Court that the new evidence "discloses a strong probability that it will change the result if a new trial is granted." . . . Dr. Kessis appears to opine that the serology test admitted in the Defendant's trial does not exclude the Defendant (1 in 4167 males) and may have been deposited on the underwear of the victim by casual or innocent contact. The testimony at trial appears to exclude contact with another male. In addition, the most damaging evidence against the Defendant was the victim's admissible hearsay testimony that the Defendant touched her "in her butterfly," indicating her vagina. (Tr. 197). On another occasion the victim told her mother that the Defendant "stuck his fingers up in [her]" and it had been going on since the victim was four or five years old. . . .
>
> If Defendant's attorney had obtained Dr. Kessis prior to trial and Dr. Kessis had testified consistent with his letter (Exhibit A), the testimony would have supported the States' theory that Defendant could not have been excluded by the serology evidence.

(*Decision Denying Defendant's Motions for a New Trial*, ECF No. 13-1, PAGEID # 1546-47.)

*judicata* from claiming that he was unavoidably prevented from discovering the information contained in that affidavit.

(PAGEID # 2951; PAGEID # 2953-54.)

Although Petitioner now disputes that determination, he nonetheless has thereby procedurally defaulted his proposed amended claims relating to prosecutorial misconduct and ineffective assistance of counsel, barring them from this Court's review. *See Petrone v. Bunting*, 2015 WL 9918661, at *9-10 (N.D. Ohio Dec. 10, 2015) (enforcing procedural default based on state court's dismissal of motion for a new trial as untimely) (citations omitted).

> [W]here the state appellate court interpreted Crim R. 33 in accordance with Ohio law, a federal habeas court is bound by that ruling. *See Veliev v. Warden, Chillicothe Corr. Inst.*, No. 2:12–CV–00346, 2014 WL 4805292, at *13 (S.D.Ohio Sept. 26, 2014) (citing *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir.2005) (this court must "defer to a state court's interpretation of its own rules of evidence and procedure"); *Bennett v. Warden, Lebanon Correctional Inst.*, 782 F.Supp.2d 466, 478 (S.D. Ohio March 15, 2011) ("[T]he state courts are the final authority on state-law issues, the federal habeas court must defer to and is bound by the state court's rulings on such matters.") (citing *Estelle v. McGuire*, 502 U.S. 62, 67, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("it is not the province of a federal habeas court to re-examine state-court determinations on state law questions.")).

*Id*. at *10.

Moreover, Petitioner's claim that the state trial court abused its discretion in denying his motions for a new trial without an evidentiary hearing does not present an issue appropriate for federal habeas corpus relief. *See Thornton v. Buchanan*, No. 2:17-cv-702, 2019 WL 2373771, at *7 (S.D. Ohio June 5, 2019) (noting that the United States Supreme Court has never held that it is unconstitutional to deny a motion for a new trial without a hearing, and that this claim therefore does not provide a basis for relief). "'State collateral proceedings are not constitutionally required as an adjunct to the state criminal proceedings,'" so there can be no federal constitutional requirement of an evidentiary hearing in state post-conviction proceedings." *Id*. (citing *Murray v. Giarratano*, 492 U.S. 1, 10 (1989)). "[H]abeas corpus

cannot be used to mount challenges to a state's scheme of post-conviction relief." *Leonard v. Warden*, 846 F.3d 832, 854 (6th Cir. 2017) (citing *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001)) (citing *Kirby v. Dutton,* 794 F.2d 245, 246 (6th Cir. 1986); *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007)). "[T]he Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *Farrow v. Anderson*, No. 1:08CV1429, 2009 WL 3004024, at *5 (N.D. Ohio Sept. 15, 2009) (citing *Kirby*, 794 F.2d at 246-47; *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002)). This is because "'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'" *Id.* (quoting *Kirby*, 794 F.2d at 246 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973))).

> It is settled law in the Sixth Circuit that alleged errors in post-conviction proceedings, such as the failure to grant evidentiary hearings, are outside the scope of federal habeas review. *Cornwell v. Bradshaw*, 559 F.3d 398, 411 (6th Cir. 2009) (petitioner's claim that the state court improperly denied him an evidentiary hearing not cognizable in habeas corpus proceedings); *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007); *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986) ("We decline to allow the scope of the writ to reach this second tier of complaints about deficiencies in state post-conviction proceedings.").

*Johnson v. Lazaroff*, No. 1:15CV43, 2016 WL 791609, at *15 (N.D. Ohio Jan. 6, 2016).

Petitioner also seeks to amend the petition to include an additional claim of ineffective assistance of appellate counsel. (*Amended Petition*, ECF No. 56-2, PAGEID # 3191.) However, Petitioner already has raised a claim of ineffective assistance of appellate counsel. (*Petition*, ECF No. 1, PAGEID # 17.) He proposes to amend the Petition to add at least some duplicative arguments in support. However, Petitioner has already filed lengthy arguments in support. Nothing prevented him earlier from raising these same arguments. Moreover, Petitioner has procedurally defaulted any new proposed amended claims of ineffective assistance of appellate counsel that he did not present in Rule 26(B) proceedings. *See Williams v. Bagley*, 380 F.3d 932,

971 (6th Cir. 2004); *Davis v. Lazaroff*, No. 1:16-cv-2131, 2018 WL 8139300, at *6 (N.D. Ohio Oct. 17, 2018) ("Any ineffective-assistance claims that [a petitioner] could have properly asserted, but did not, are defaulted under the Ohio doctrine of *res judicata*.") (citing *Jacobs*, 265 F.3d at 417; *Coleman*, 244 F.3d at 538; *Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (syllabus, ¶9)).

Amendment of the petition at this time with procedurally defaulted claims would be an exercise in futility. *See United States v. Gibson*, 424 F. App'x 461, 466-67 (6th Cir. 2011). The amendment of the petition with Petitioner's proposed new claims additionally would cause undue prejudice. Petitioner filed this action approximately one year ago. Respondent has already filed a Return of Writ. (ECF No. 14). Petitioner has filed a lengthy Merit Brief and Reply. (ECF Nos. 6, 56.) The matter is ripe for adjudication. It would be unduly prejudicial to require Respondent to respond to entirely new claims and lengthy arguments in support in what appears to be a revised Merit Brief including revised arguments and unidentified alterations in the substance of Petitioner's claims at this stage in the litigation. *See Glenn v. Coleman*, No. 3:13-cv-1090, 2014 WL 4983661, at *7 (N.D. Ohio Oct. 6, 2014) (denying untimely filed motion to amend the petition with new claims as unduly prejudicial).

Petitioner's Motion to Amend and Stay (ECF No. 53) therefore is **DENIED.**

## III.  Motion for Non Publication of Documents

Petitioner has filed a motion requesting that this Court's rulings remain unpublished or, liberally construing his pleadings, that they be filed under seal in view of the alleged victim's age as a minor child.[3]

---

[3] The alleged victim was born in March 2006. *See State v. Fetherolf*, 2017 WL 1316207, at *1.

"Every court has supervisory power over its own records and files." *Nixon v. Warner Commc'ns*, 435 U.S. 589, 598 (1978). Historically, however, there has been a presumption of openness and public access to judicial proceedings and documents. *Press-Enterprise Co. v. Superior Court of Cal. (Press-Enterprise II)*, 478 U.S. 1, 10 (1986); *Press-Enterprise Co. v. Superior Court of Cal. (Press-Enterprise I)*, 464 U.S. 501, 507 (1984); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980). Addressing the presumption of access to judicial proceedings, in *Press-Enterprise II*, the Supreme Court held that there is a qualified right of public access to judicial proceedings, rooted in the First Amendment, if there is "a tradition of accessibility" to the nature of the proceedings involved and if public access "plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8-9. The "right of access is, in part, founded on the societal interests in public awareness of, and its understanding and confidence in, the judicial system." *Application of National Broadcasting Co., Inc*., 828 F.2d 340, 345 (6th Cir. 1987) (internal quotation marks and citations omitted.) Thus, "the presumptive right of the public to inspect and copy judicial documents and files[,]" which the United States Court of Appeals for the Sixth Circuit as described as a "long-established legal tradition" limits a court's discretion to seal records from public inspection. *In re Knoxville News-Sentinel Co., Inc.,* 723 F.2d 470, 473–74 (6th Cir. 1983); *see also Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1178–80 (6th Cir. 1983) (discussing the justifications for the "strong presumption in favor of openness"). "Placing court pleadings under seal is generally disfavored, in view of the long tradition valuing public access to court proceedings." *Garner v. Mitchell*, No. 1:98-cv-870, 2010 WL 11606310, at *1 (S.D. Ohio April 28, 2010) (citing *Proctor & Gamble Co. v. Banker's Trust Company,* 78 F.3d 219, 227 (6th Cir. 1996). Therefore, "[o]nly the most compelling reasons can justify non-disclosure of judicial

records." *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016) (internal quotation marks and citation omitted). The Sixth Circuit has indicated that exceptions fall into two categories: (1) exceptions "based on the need to keep order and dignity in the courtroom"; and (2) "content-based exemptions," which "include certain privacy rights of participants or third parties, trade secrets, and national security." *Brown & Williamson Tobacco Corp.*, 710 F.2d at 1179 (citations omitted). The Sixth Circuit has emphasized the public's "strong interest in obtaining the information contained in the Court record." *Shane Grp., Inc.*, 825 F.3d at 305 (internal quotation marks and citation omitted); *see also In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919, 939 (6th Cir. 2019) ("'[T]he greater the public interest in the litigation's subject matter, the greater the showing necessary to overcome the presumption of access.'") (quoting *Shane Grp., Inc.*, 825 F.3d at 305). Accordingly, district courts must consider "each pleading [to be] filed under seal or with redactions and to make a specific determination as to the necessity of nondisclosure in each instance" and must "bear in mind that the party seeking to file under seal must provide a 'compelling reason' to do so and demonstrate that the seal is 'narrowly tailored to serve that reason.'" *In re Nat'l Prescription Opiate Litig.*, 927 F.3d at 940 (quoting *Shane Grp.*, 825 F.3d at 305). If a district court "permits a pleading to be filed under seal or with redactions, it shall be incumbent upon the court to adequately explain 'why the interests in support of nondisclosure are compelling, why the interests supporting access are less so, and why the seal itself is no broader than necessary.'" *Id.* (quoting *Shane Grp., Inc.,* 825 F.3d at 306).

Here, the Court is not persuaded compelling interests justify the nonpublication or sealing of records or proceedings in this matter. Further, the public interest in these habeas corpus proceedings, particularly in view of the crimes charged, is strong, and the record does not reflect

any unusual circumstances to justify Petitioner's request. To the contrary, the name of the alleged victim has been redacted from the state court record, as it will also be here, and her privacy protected in that manner.

Petitioner's Motion for Non Publication of Documents (ECF No. 59) is **DENIED**.

## IV. Motion for Evidentiary Hearing

Petitioner seeks an evidentiary hearing in support of habeas corpus claims seven, eight, and nine, in which he asserts that he was denied the effective assistance of trial and appellate counsel, and denied a fair trial based on admission of DNA evidence. Petitioner seeks to call the prosecutor, police, defense counsel, and Dr. Kessis to testify at such a hearing, in order to further develop the factual basis for these claims. (ECF No. 60, PAGEID # 3507.) Petitioner argues that he acted diligently in attempting to do so in the state courts.[4]

Respondent opposes Petitioner's request. (ECF No. 61.) It is the Respondent's position that Petitioner has procedurally defaulted his claim of ineffective assistance of trial counsel. In response, Petitioner argues that the Respondent has misconstrued his claims, as did the state courts. Petitioner maintains that Kessis' letter contradicts and rebuts the false and misleading testimony of prosecution witnesses and the prosecutor regarding DNA evidence. (*See Petitioner's Response to Respondent's Opposition to his Evidentiary Hearing*, ECF No. 63.)

---

[4] This Court does not agree. Petitioner's off-the-record claims would properly be raised in post-conviction proceedings. The state trial court denied Petitioner's April 2017 Petition to Vacate or Set Aside Judgment of Conviction or Sentence in relevant part as follows:

> Defendant claims his counsel was ineffective with respect to 25 different matters. Many of the matters asserted took place during the trial and are part of the record. . . . With respect to matters outside the record (i.e., 14 - "failed to conduct an investigation") the Defendant has failed to provide this Court with any evidence of what would have been different at trial had his attorney done the things Defendant claims he should have done[.]

(*Decision Denying Petition*, ECF No. 13-1, PAGEID # 1202.) Petitioner apparently did not file an appeal of the trial court's decision denying his post-conviction petition.

Petitioner argues that § 2254(d) does not apply.  (*See id; see also Supplemental Response to Respondent's Opposition to Petitioner's Evidentiary Hearing*, ECF No. 64.)

The record does not indicate that Petitioner acted diligently in attempting to develop the factual basis for his claim of ineffective assistance of counsel.  To the contrary, the trial court denied Petitioner's April 2017 Petition to Vacate or Set Aside Judgment of Conviction or Sentence in relevant part as follows:

> Defendant claims his counsel was ineffective with respect to 25 different matters. Many of the matters asserted took place during the trial and are part of the record. . . . With respect to matters outside the record (i.e., 14 - "failed to conduct an investigation") the Defendant has failed to provide this Court with any evidence of what would have been different at trial had his attorney done the things Defendant claims he should have done[.]

(Decision Denying Petition, ECF No. 13-1, PAGEID # 1202.)  Petitioner apparently did not file an appeal of the trial court's decision denying his post-conviction petition.  Moreover, an evidentiary hearing will not assist the Court in resolving the issue of procedural default.  As to Petitioner's claim of ineffective assistance of appellate counsel denial of a fair trial due to admission of DNA evidence, it is the Respondent's position that these claims lack merit.

The Supreme Court has held that this Court must limit its review under 28 U.S.C. § 2254(d)(1) of claims adjudicated on the merits to the record considered by the state court. *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).  "[D]istrict courts are precluded from conducting evidentiary hearings to supplement existing state court records when a state court has issued a decision on the merits with respect to the claim at issue." *Stermer v. Warren*, 360 F.Supp.3d 639, 660 (E.D. Mich. 2018) (quoting *Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013)).

Accordingly, Petitioner's Motion for Evidentiary Hearing (ECF No. 60) is **DENIED**.

## V. Standard of Review

The standards of the Antiterrorism and Effective Death Penalty Act ("the AEDPA") govern this case. The United States Supreme Court has described the AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011) ); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

The AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Further, under the AEDPA, the factual findings of the state court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley,* 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)), *cert. denied sub nom. Coley v. Robinson*, 571 U.S. 992 (2013). The United States Court of Appeals for the Sixth Circuit has summarized these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,] or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389. 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Id*. at 748-49. The burden of satisfying the AEDPA's standards rests with the petitioner. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## VI. Claim One

In claim one, Petitioner asserts that he was denied a fair trial due to the admission of prior bad acts evidence indicating that Petitioner had committed other crimes, including assault and pandering, that he was on probation for failure to pay child support, and that he wanted his girlfriend to dress up like a child. Petitioner contends that the prosecutor improperly presented this evidence. (*Merit Brief*, ECF No. 6, PAGEID # 627, 634.) He further asserts that the trial court issued improper jury instructions and failed to hold a hearing prior to ruling that the

evidence was admissible. For the reasons discussed previously, Petitioner has waived these latter claims by failing to raise them on direct appeal.

As to his claim of improper admission of other acts evidence, the state appellate court rejected that claim as follows:

{¶ 38} In Fetherolf's second assignment of error, he argues that the trial court erred by permitting "other acts" evidence that he contends had no bearing on any fact of consequence, and that the trial court erred by failing to exclude details of Fetherolf's prior conviction and sentence when he did not testify.

Standard of Review

{¶ 39} "'The admission of * * * [other-acts] evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that created material prejudice.'" *State v. Morris*, 132 Ohio St.3d 337, 2012–Ohio–2407, ¶ 14, quoting *State v.* Diar, 120 Ohio St.3d 460, 2008–Ohio–6266, ¶ 66. Under an abuse of discretion review, "[i]t is not sufficient for an appellate court to determine that a trial court abused its discretion simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments." *Morris* at ¶ 14, citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). An abuse of discretion standard is a deferential review. *Id.*

"Other Acts" Evidence

{¶ 40} The admission of "other acts" evidence is governed in part by Evid.R. 404(B), which reads,

(B) Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

{¶ 41} In this case, Fetherolf contends that the trial court erred by allowing Pamela Hawkins, Fetherolf's former paramour, to testify regarding consensual sexual acts that occurred between them, which were unrelated to the charged crimes, thus

constituting impermissible "other acts" evidence. In particular, Fetherolf argues that it was error to allow a portion of the following testimony.

Q [Prosecutor]: When you were with [Fetherolf] during this time, did you see him on the computer?

A [Hawkins]: He was on my Tablet.

Q: Your Tablet?

A: Yes, and my cell phone.

Q: Did you see anything on your Tablet that concerned you?

[Defense Counsel]: Objection, Your Honor.

THE COURT: Overruled. I'm going to permit this witness to testify to certain matters that appear to be other acts that the defendant was allegedly involved in and I'm not going to permit this testimony to be introduced to prove the character of the defendant or he acted in conformity with character but it's being introduced for the sole purpose to prove his motive, his opportunity, his intent, his preparation, plan or knowledge or identity [sic].

So, it is only going to be used for that purpose, alone, and not to prove his character. Go ahead.

[Prosecutor]: Thank you, Your Honor.

Q: What was it that you saw on your Tablet?

A: Um, this was after we left Debbie and them's place. We went and stayed at a motel there in Marion and—this is hard for me to say—[Fetherolf] wanted to go to Wal–Mart for me to—

Q: Let's talk about—or are you talking about the Tablet now?

A: Yes.

Q: Okay.

A: [Fetherolf] was looking on the Tablet at some young girls. I'm not going to say they were—I'm going to say between 13 and younger. Some, maybe, 15 and younger and it was some unappropriate (sic) pictures that nobody should be looking at and he just asked me what I thought it would be like to be with a young girl like that and I just, at the time, it didn't really register because I was, you know, drinking a lot at the time and it just didn't register how he was acting and how he was talking.

Q: And then after that, did he—did you go somewhere?

A: He wanted to go to Wal–Mart. Um, he had some money sent to him by Western Union from his mother * * * and we were going to go and get a 24 pack of Busch beer and he started going over to where I was getting some potato chips and things and then I was walking around getting ready to go to the register and I looked over and he was over by the little girl's, teenage girl's clothing and I thought—I went over and asked him, what are you doing? And he said, oh, I want to get—what size—

[Defense Counsel]: Objection, Your Honor.

A: —what size do you think—

THE COURT: Okay, overruled.

Q: Go ahead.

THE COURT: Again, the same admonition. It's not to prove character. It's to prove the other things I already mentioned to you. Go ahead.

A: Sorry. He wanted to know what size I would wear in thong underwear and asked me where the wigs would be at and I said, what are you talking about? And he said, well, I want you to dress up as a little girl tonight for me. Okay, you know, I didn't know what to think of that but he got a blonde wig, blue thong underwear. Got me a strapless bra-shirt kind of thing and, like, a little mini skirt kind of thing and I wore it for him that night.

Q: Did this happen more than one time?

A: It happened three times.

Q: And, I mean, not that you went to the store but you wore it three different times?

A: I wore it twice. He wore it once.

(March 8, 2016, Tr. at 135–137).  [FN]11

FN11:  Notably, before Hawkins ever testified, the parties discussed her presumed testimony and its admissibility.  The court heard arguments from both parties and ruled that the testimony was admissible.

{¶ 42} Fetherolf contends that the preceding testimony related to consensual sexual acts between himself and Hawkins, both adults, should have had no bearing on this Rape trial and that they were improperly admitted. He does not argue on appeal, as

he did at the trial court level, that the testimony related to viewing inappropriate pictures of underage girls on the tablet was improperly admitted.

{¶ 43} In our analysis of the issue raised by Fetherolf, we emphasize that during Hawkins' testimony, the trial court interrupted to specifically admonish the jury, twice, to inform the jury that the testimony could only be used for the purposes specified in Evid.R. 404(B). Arguably the evidence does touch on some of the exceptions listed in Evid.R. 404(B), which permits testimony regarding certain other acts; however, it is undoubtedly prejudicial and it is our conclusion that any contention that it does fit under the 404(B) exceptions is tenuous at best.

{¶ 44} Nevertheless, the trial court is given broad discretion in these matters and we may not reverse simply because we may have made a different decision. Even assuming that it was error to allow the introduction of the consensual sexual acts we cannot find that such an error prejudiced Fetherolf given the evidence presented at trial, which has been previously referenced. Therefore, Fetherolf's argument is not well-taken.

Prior Conviction

{¶ 45} Next, Fetherolf contends that the trial court erred by allowing testimony that Fetherolf was on probation for an unrelated offense when he allegedly committed the crimes in this case.

{¶ 46} In this case, the fact that Fetherolf was on probation when he committed the Rape of A.C. in September of 2013 was first introduced through the testimony of Hawkins. Hawkins testified that during the fall of 2013, Fetherolf slept on the couch at the residence of Hawkins and her husband. Hawkins testified that she left her husband in the fall of 2013 to be with Fetherolf when Fetherolf suggested they go for a "change of scenery." (March 8, 2016, Tr. at 131).

{¶ 47} Hawkins testified that Fetherolf informed her that he was on probation for "felony child support" and that there was probably a warrant out for his arrest. (*Id.* at 132). Hawkins testified that she thought that was the reason Fetherolf wanted to get away. Hawkins testified that she and Fetherolf went to Catskill, New York, then later to Pennsylvania to a motel, then to Marion, Ohio. Hawkins testified that at one point Fetherolf took the battery out of his cell phone because "they" were looking for him and they would not be able to locate where he was at.

{¶ 48} Hawkins testified that she was eventually pulled over by the police while driving alone and was arrested for an active warrant. Hawkins testified that she did jail time and when she got out she called the police on Fetherolf, thinking he had a warrant for felony child support. Hawkins testified that she learned at that time that he was also wanted for Rape.

{¶ 49} Later, Fetherolf's probation for an unrelated offense was mentioned again at trial when his probation officer, Edward Worley, testified. Worley testified that he was in charge of "felony non-support child support cases" and that Fetherolf was his probationer.

{¶ 50} During Worley's testimony, the trial court interrupted sua sponte and a sidebar conference was held. At that time, the trial court inquired as to the purpose of Worley's testimony and the trial court stated, without prompting by the defense that, "I never would have allowed him to testify in the first place about being on probation because now this felony conviction is evidence and he hasn't taken the stand and that's not proper." (March 9, 2016, Tr. at 60).

{¶ 51} When Worley's testimony resumed, he testified that he lost contact with Fetherolf at some point and that he tried to locate him. Worley testified that Fetherolf was eventually apprehended and that Fetherolf admitted to his "violations" and the failure to pay his support. (*Id*. at 62). Worley then testified that on the day Fetherolf was arrested, he obtained Fetherolf's DNA, which was the standard used to test against the samples taken from A.C.

{¶ 52} On appeal, Fetherolf argues that it was error for the trial court to permit any testimony regarding Fetherolf's convictions when Fetherolf did not testify. Fetherolf contends that pursuant to Evid.R. 609(A)(2), evidence of a prior conviction of a defendant can be introduced, but only if the accused chooses to testify.

{¶ 53} In our own review, we would note that Fetherolf did not object to the preceding testimony. In fact, even after the trial court noted that it would not have allowed testimony related to probation, Fetherolf's trial counsel still did not object when Worley testified that Fetherolf admitted to violations of his child support.

{¶ 54} Even if we assumed that the testimony related to Fetherolf's prior conviction was not admissible, it can be argued that it was a valid trial strategy by the defense to allow in testimony that Fetherolf was on probation for a non-violent offense. Fetherolf essentially left the Marysville area right after the alleged incident with A.C. and without another valid reason to leave—such as running from child support—it could have appeared to the jury that Fetherolf was fleeing from a crime against A.C. that he knew he had committed. Thus defense counsel may have wanted this testimony to be introduced for a valid purpose.

{¶ 55} Nevertheless, even if we presumed that Fetherolf did object and that the testimony was not admissible, we cannot find that the mentions of Fetherolf's probation and his felony child support so tainted the proceedings that his convictions must be reversed, particularly given that it had some arguable benefit to the defense. Moreover, the State's case was relatively strong insofar as statements of A.C. were actually corroborated in this case by the DNA evidence.

Therefore, Fetherolf's argument is not well-taken, and his assignment of error is overruled.

*State v. Fetherolf*, 2017 WL 1316207, at *7-10.

Generally, alleged errors in evidentiary rulings do not support a writ of habeas corpus.

*See Estelle v. McGuire*, 502 U.S. 62 (1991); *see also Moreland v. Bradshaw*, 699 F.3d 908, 923

(6th Cir. 2012) (citations omitted). To be entitled to habeas relief, a petitioner must demonstrate

that the evidentiary ruling was "so fundamentally unfair that it rises to the level of a due-process

violation." *Collier v. Lafler*, 419 F. App'x 555, 558 (6th Cir. 2011) (citing *Coleman v. Mitchell*,

244 F.3d 533, 542 (6th Cir. 2001)). "Generally, state-court evidentiary rulings cannot rise to the

level of due process violations unless they 'offend[ ] some principle of justice so rooted in the

traditions and conscience of our people as to be ranked as fundamental.'" *Bugh v. Mitchell*, 329

F.3d 496, 512 (6th Cir. 2003) (citing *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000)

(quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). In order to establish a due process

violation under the AEDPA rooted in an evidentiary ruling, the Sixth Circuit typically has

required a Supreme Court case establishing a due process right with regard to that specific kind

of evidence. *Id*. (citing *Maldonado v. Wilson*, 416 F.3d 470, 477 (6th Cir. 2005)). However,

there is no clearly established Supreme Court precedent holding that a state violates due process

by permitting propensity evidence in the form of other bad acts evidence. *Bugh v. Mitchell*, 329

F.3d at 512. Consequently, even if the trial court's admission of prior-bad-act evidence is

viewed as "egregious error," the petitioner cannot meet the mandatory AEDPA showing that the

Ohio Court of Appeals' decision rejecting his claim constituted an unreasonable application of

Supreme Court caselaw. *See Goldick v. Warden*, Ross *Correctional Inst*., No. 3:11-cv-00441,

2013 WL 2377638, at *9 (S.D. Ohio May 30, 2013) (citing *Harrington* v. *Richter*, 562 U.S. 86,

101-102 (2011)).  Thus, Petitioner's claim that the state courts deprived him of a constitutionally

fair trial due to the admission of other bad acts evidence does not provide him a basis for relief.

Claim one is without merit.

## VII.  Claim Two

In claim two, Petitioner asserts that the prosecutor violated *Brady v. Maryland*, 373 U.S.

83 (1963), by failing to disclose Pamela Hawkins' prior criminal record.[5]  The state appellate

court rejected this claim, reasoning as follows:

> Fetherolf contends that the State committed discovery violations by failing to
> disclose Pamela Hawkins's 2015 misdemeanor conviction for falsification.
>
> Standard of Review
>
> {¶ 57} In order to reverse a defendant's conviction specifically due to a discovery
> violation, it must be shown that "'(1) the prosecution's failure to disclose was a
> willful violation of the rule; (2) foreknowledge of the information would have
> benefited the accused in preparing a defense, and (3) the accused * * * suffered
> prejudice.'" *State v. Wangler*, 3d Dist. Allen No. 1–11–18, 2012–Ohio–4878, ¶
> 108, quoting *State v. LaMar*, 95 Ohio St.3d 181, 2002–Ohio–2128, ¶ 38, citing
> *State v. Joseph,* 73 Ohio St.3d 450, 458 (1995).
>
> {¶ 58} Generally, we apply an abuse of discretion standard to a trial court's decision
> to deny a motion for a new trial. *State v. Rice*, 11th Dist. Ashtabula No. 2012–A–
> 0062, 2014–Ohio–4285, ¶ 9.
>
> Fetherolf's New Trial Motion
>
> {¶ 59} In this case, after the jury found Fetherolf guilty, but before his sentencing
> hearing, he filed a number of motions with the trial court, including a motion for a
> new trial. In the motion for a new trial, Fetherolf argued*, inter alia*, that the State
> committed a discovery violation by failing to disclose that Pamela Hawkins had a
> misdemeanor falsification conviction in 2015.
>
> {¶ 60} The State responded to the motion by contending that it had provided all
> requisite discovery pursuant to Crim.R. 16. More specifically, the State contended
> that Fetherolf was provided an interview with Hawkins on June 25, 2014, and that
> Fetherolf was notified twice in 2015 that the State planned to call Hawkins as a

---

[5] Petitioner also argues that the prosecutor improperly withheld the victim's records from Mid Ohio psychological
services.  (*Traverse*, ECF No. 57-1, PAGEID # 3379-80.)  However, Petitioner did not present this same claim on
direct appeal.  For the reasons discussed *supra,* he thereby has waived this claim for review in these proceedings.

witness. The State indicated that it provided known relevant convictions at that time.

{¶ 61} In addition, the State argued that during the course of the trial Hawkins readily testified to being on probation and that she had prior convictions, although a prior conviction specifically for falsification in 2015 was not mentioned by either party. The State contended that it was unaware of a misdemeanor conviction for Hawkins occurring in 2015. Nevertheless, Hawkins did admit to being jailed on an unrelated charge.

{¶ 62} After reading the arguments of the parties, the trial court ultimately determined that Fetherolf "was not harmed by not having this information and the State was not responsible for not investigating the prior record more than it did." (Doc. No. 213).

Arguments and Analysis

{¶ 63} On appeal, Fetherolf renews his argument that the State failed to provide discovery, contending that the State should have known about the late 2015 misdemeanor conviction of Pamela Hawkins and that it should have disclosed the conviction. Fetherolf argues that Crim.R. 16(B)(2) actually required the State to disclose such information. Criminal Rule 16(B)(2) requires the State to disclose, "(2) Criminal records * * * of a witness in the state's case-in-chief * * *[.]"

{¶ 64} By contrast, the State argues that under the Supreme Court of Ohio's decision in *State v. Petro*, 148 Ohio St. 505 (1947), which discussed the granting or denial of a motion for a new trial based on newly discovered evidence, Fetherolf is unable to establish that he could not have discovered Hawkins's falsification conviction in the exercise of due diligence, precluding his motion for a new trial. [FN]12 Further the State argues that it was not required to investigate the criminal record of Hawkins all the way up to trial, and that the jury was apprised that Hawkins had prior convictions, if not this specific conviction.

FN12:  Fetherolf argues in his reply brief that *Petro* does not apply in this instance because *Petro* relates to fling a motion for a new trial under Crim.R. 33(A)(6), and this case involves a motion for a new trial pursuant to Crim.R. 33(A)(2).  Criminal Rule 33(A)(6) does not specifically relate to newly discovered evidence where the defendant could not obtain it with reasonable diligence, and Criminal Rule 33(A)(2) relates to misconduct of, *inter alia*, the prosecuting attorney.

{¶ 65} While the better practice may be for the State to continuously update the criminal records of its witnesses, we cannot find in this case the failure to do so was reversible error. This case was pending for years before it was brought to trial. The State indicated that it disclosed the relevant prior convictions that it was aware of before Hawkins was ever convicted of misdemeanor falsification in a nearby county. Here there is no indication that the State specifically tried to hide anything

from the defense, particularly since the State actually elicited testimony from Hawkins that she went to jail and had other convictions.

{¶ 66} Finally, given that Hawkins's credibility was already called into question at trial by admitting that she had prior convictions, admitting that she had gone to jail, and admitting that she was drinking to the point of addiction during the time she spent with Fetherolf, we cannot find that this one additional conviction would have cast such additional doubt on her credibility that it impacted Fetherolf's convictions. Therefore, for all of these reasons, Fetherolf's third assignment of error is overruled.

*State v. Fetherolf*, 2017 WL 1316207, at *11-12.

To the extent that Petitioner raises a claim regarding the alleged violation of state law or state discovery rules, such claim does not provide him a basis for relief. *See Baker v. Rapelje*, No. 10-cv-13304, 2013 WL 1663550, at *5 (E.D. Mich. April 17, 2013) (citing *Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002)). "It is well-settled that there is no general constitutional right to discovery in a criminal case." *Id.* (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988)). A federal court may only grant habeas relief to a person who is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Supreme Court has held that the prosecutor's failure to disclose evidence favorable to the defense "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 86. Evidence is material "[i]f there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Moreover, "[i]mpeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule." *O'Guinn v. Dutton*, 88 F.3d 1409, 1418 (6th Cir. 1996) (citing *United States v. Bagley*). However, "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence

would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). "In the absence of prejudice, even assuming a violation of *Brady*, reversal is not required." *United States v. Jones*, 766 F.2d 994, 998 n. 1 (6th Cir. 1985) (citing *United States v. Campagnuolo*, 592 F.2d 852, 861 & n. 9 (5th Cir. 1979)). It is the Petitioner's burden to establish a *Brady* violation. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). Petitioner has failed to meet this burden here.

As discussed by the state appellate court, Hawkins acknowledged that she was drinking and using drugs when she was with Petitioner. (*Transcript,* ECF No. 13-3, PAGEID # 1925, 1939, 1945.) She also had two warrants out for her arrest. (PAGEID # 1927-28.) She was on probation and had failed to pay a fine. (PAGEID # 1928.) She spent thirty days in jail for violating the terms of her probation. (PAGEID # 1929.) In view of this record, Petitioner has failed to establish prejudice from the prosecutor's failure to disclose Hawkins' 2015 misdemeanor conviction. The record does not indicate that the state appellate court contravened or unreasonably applied federal law in rejecting Petitioner's claim.

Claim two is without merit.

## VIII. Claim Five

In claim five, Petitioner raises various allegations of prosecutorial misconduct. On direct appeal, Petitioner asserted that the prosecutor improperly elicited opinion testimony from Dr. McManus, S.A.N.E. nurse Warnimont, and caseworker Ruddy regarding the credibility of the alleged victim; improperly elicited testimony that Petitioner had a prior felony conviction for failure to pay child support and had violated the terms of his probation; and failed to disclose that Hawkins had been convicted of falsification in 2015. (*See Merit Brief of Appellant Michael Fetherolf*, ECF No 13, PAGEID # 938.)

The appellate court rejected Petitioner's claim of prosecutorial misconduct as follows:

Fetherolf argues that the prosecutor committed misconduct that deprived him of a fair trial. Specifically, he contends that the prosecutor committed misconduct for eliciting the testimony he claims was erroneous in the first and second assignments of error and that the prosecutor committed misconduct by failing to disclose Hawkins's prior conviction for falsification referenced in the third assignment of error.

Standard of Review

{¶ 68} Prosecutorial misconduct is generally not grounds for reversal unless it so taints the proceedings as to deprive the defendant of a fair trial. *State v. Johns*, 3d. Dist. Seneca No. 13–04–23, 13–04–24, 13–04–25, 2005–Ohio–1694, ¶ 25. Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011–Ohio–5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007–CA–51, 2008–Ohio–2900, ¶ 42, citing *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464 (1986). "In making this determination, an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995).

Analysis

{¶ 69} Individually, we have found that none of the assigned errors by Fetherolf were reversible. In this assignment of error, he argues essentially that the prosecutor's cumulative actions render his convictions reversible. Given the evidence in this case, complete with DNA, and as noted earlier the jury's ability to at least observe and evaluate the victim's demeanor, even if she did not testify regarding the acts specifically, we cannot find that any errors we have found in this case cumulatively resulted in reversible error based on prosecutorial misconduct. This is particularly true given that defense counsel did not object to some of the testimony, possibly on the basis of trial strategy, and given that some of the testimony elicited was not objectionable at all. Thus we cannot find any prosecutorial misconduct in this case that rises to the level of prejudicial error, and Fetherolf's fourth assignment of error is overruled.

*State v. Fetherolf*, 2017 WL 1316207, at *12.

The scope of federal habeas corpus review of a claim of prosecutorial misconduct is

narrow. A federal court does not sit as an appellate court employing supervisory powers to

rectify ordinary trial error in cases before it for habeas review. *Donnell v. De Christoforo*, 416 U.S. 637 (1974). Rather, the Court must consider only whether the prosecutor's conduct was so egregious as to deny the petitioner fundamental fairness. *Id.* at 642–43; *Martin v. Foltz*, 773 F.2d 711, 716–17 (6th Cir. 1985); *Angel v. Overberg*, 682 F.2d 605, 607 (6th Cir. 1982) (*en banc*). This determination is made by evaluating the totality of the circumstances surrounding the case. *Angel v. Overberg*, 682 F.2d at 607.

> Factors relevant in making this inquiry are: the degree to which the remarks may tend to mislead the jury and to prejudice the accused; whether the remarks were isolated or extensive; whether they were deliberately placed before the jury; and the strength of the case against the accused. Finally, this Court notes the "extreme nature of the prosecutorial misconduct required for a federal court to issue the writ."

*Martin v. Foltz*, 773 F.2d at 716 (citations omitted) (quoting *Cook v. Bordenkircher*, 602 F.2d 117, 120 (6th Cir. 1979)).

As noted by the state appellate court, Petitioner failed to object to much of the testimony he now refers to in support of his claim of prosecutorial misconduct. For example, he did not object to the testimony he characterizes as improper vouching for the veracity of the alleged victim. *State v. Fetherolf*, 2017 WL 1316207, at *6. Also, he did not object to admission of testimony regarding his prior felony conviction or status on probation. *Id.* at *10.

> In fact, even after the trial court noted that it would not have allowed testimony related to probation, Fetherolf's trial counsel still did not object when Worley testified that Fetherolf admitted to violations of his child support.

> {¶ 54} Even if we assumed that the testimony related to Fetherolf's prior conviction was not admissible, it can be argued that it was a valid trial strategy by the defense to allow in testimony that Fetherolf was on probation for a non-violent offense. Fetherolf essentially left the Marysville area right after the alleged incident with A.C. and without another valid reason to leave—such as running from child support—it could have appeared to the jury that Fetherolf was fleeing from a crime against A.C. that he knew he had committed. Thus defense counsel may have wanted this testimony to be introduced for a valid purpose.
> Claim two is without merit.

*Id.* As discussed below, Petitioner thereby has waived his right to raise these issues here. *See Schauer v. McKee*, 410 F. App'x 97, 101 (6th Cir. 2010).

Moreover, the record does not support Petitioner's allegation that other prosecution witnesses improperly testified as to the veracity of the alleged victim.

> Fetherolf mischaracterizes the testimony in the record on appeal. For instance, in his brief he contends that "[b]oth Dr. McManus and [the SANE] testif[ied] that, in their expert opinion, A.C. and her mother are credible." (Appt.'s Br. at 16). He also argues that Detective Flanagan and Kaitlyn Ruddy, an intake caseworker at the department of job and family services, testified that that A.C. was credible. These claims are simply inaccurate and do not reflect the testimony. There was testimony from some of these witnesses that A.C. and her mother were consistent in their statements, but these witnesses never testified specifically that A.C. was credible.

*State v. Fetherolf*, 2017 WL 1316207, at *6. Thus, the prosecutor did not improperly submit opinion testimony from prosecution witness, with the possible exception of a statement made by Sane nurse Teresa Warnimont indicating that what children "say happened is what happened[.]" *Id.* at *7. The record further indicates that, prior to trial, the parties discussed Hawkins' proposed testimony and its admissibility. The trial "court heard arguments from both parties and ruled that the testimony was admissible." *Id.* at *9 n. 11. Although the prosecutor failed to disclose Hawkins' 2015 falsification conviction, the record indicate that this appears to have been an oversight, and Hawkins nonetheless admitted to being on probation and being jailed on an unrelated charge.

In view of this record, this Court is not persuaded that the totality of circumstances reflect that relief is warranted based on Petitioner's claim of prosecutorial misconduct.

## IX. Procedural Default

It is the Respondent's position that Petitioner has procedurally defaulted all of his remaining claims, with the exception of the claims he raised in Rule 26(B) proceedings.

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If the prisoner fails to do so, but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971). Where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do

so. As the Supreme Court found in *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case—that is, they are "procedurally defaulted."

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Scuba v. Brigano*, 259 F. App'x 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin*). First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. Second, the court must determine whether the state courts actually enforced the state procedural sanction. Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Maupin*, 785 F.2d at 138. Finally, if "the court determines that a state procedural rule was not complied with and that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he or she was actually prejudiced by the alleged constitutional error. *Id.*

Turning to the fourth part of the *Maupin* analysis, in order to establish cause, petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective counsel may constitute cause to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In order to constitute cause, an ineffective assistance of counsel claim generally must "'be presented to the state courts as an independent

claim before it may be used to establish cause for a procedural default.'" *Edwards*, 529 U.S. at

452 (quoting *Murray v. Carrier*, 477 U.S. 478, 479 (1986)).  That is because, before counsel's

ineffectiveness will constitute cause, "that ineffectiveness must itself amount to a violation of the

Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted."

*Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir. 2005).  Or, if procedurally defaulted,

petitioner must be able to "satisfy the 'cause and prejudice' standard with respect to the

ineffective-assistance claim itself."  *Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000).  The

Supreme Court explained the importance of this requirement:

> We recognized the inseparability of the exhaustion rule and the procedural-default
> doctrine in *Coleman*: "In the absence of the independent and adequate state ground
> doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion
> requirement by defaulting their federal claims in state court. The independent and
> adequate state ground doctrine ensures that the States' interest in correcting their
> own mistakes is respected in all federal habeas cases." 501 U.S., at 732, 111 S.Ct.
> 2546, 115 L.Ed.2d 640. We again considered the interplay between exhaustion and
> procedural default last Term in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct.
> 1728, 144 L.Ed.2d 1 (1999), concluding that the latter doctrine was necessary to "
> 'protect the integrity' of the federal exhaustion rule." Id., at 848, 526 U.S. 838, 119
> S.Ct. 1728, 144 L.Ed.2d 1 (quoting id., at 853, 526 U.S. 838, 119 S.Ct. 1728, 144
> L.Ed.2d 1 (STEVENS, J., dissenting)). The purposes of the exhaustion
> requirement, we said, would be utterly defeated if the prisoner were able to obtain
> federal habeas review simply by "'letting the time run'" so that state remedies were
> no longer available. *Id.*, at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1. Those
> purposes would be no less frustrated were we to allow federal review to a prisoner
> who had presented his claim to the state court, but in such a manner that the state
> court could not, consistent with its own procedural rules, have entertained it. In
> such circumstances, though the prisoner would have "concededly exhausted his
> state remedies," it could hardly be said that, as comity and federalism require, the
> State had been given a "fair 'opportunity to pass upon [his claims].'" *Id.*, at 854,
> 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting) (emphasis
> added) (quoting *Darr v. Burford*, 339 U.S. 200, 204, 70 S.Ct. 587, 94 L.Ed. 761
> (1950)).

*Edwards*, 529 U.S. at 452–53.

If, after considering all four factors of the *Maupin* test, the court concludes that a

procedural default occurred, it must not consider the procedurally defaulted claim on the merits

unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)).

### a. Application

In claim one, Petitioner asserts, *inter alia*, that he was denied a fair trial because the trial court failed to issue appropriate jury instructions or conduct a hearing before making a determination on the admissibility of other bad acts evidence. In claim two, Petitioner asserts, *inter alia*, that the prosecutor failed to disclose the alleged victims' medical reports. In claim three, Petitioner asserts that his convictions violate the Confrontation Clause. In claim four, Petitioner asserts that his convictions are against the manifest weight of the evidence[6] and that the evidence is constitutionally insufficient to sustain his convictions. (*Merits Brief*, ECF No. 6, PAGEID # 678.) In claim five, Petitioner asserts that the prosecution submitted perjured or false testimony and misrepresentations from material witnesses. In claim seven, Petitioner asserts that he was denied a fair trial due to the ineffective assistance of trial counsel. In claim nine, Petitioner asserts that he was denied a fair trial due to the improper admission of DNA evidence. Petitioner failed to raise any of the foregoing claims on direct appeal, where he had the representation of new counsel. Further, he may now no longer do so, under Ohio's doctrine of

---

[6] Petitioner's claim that his convictions are against the manifest weight of the evidence does not, in any event, provide a basis for federal habeas corpus relief. *See Durdin v. Warden, Mansfield Correctional Institution*, No. 2:16-cv-355, 2017 WL 1281418, at *13 (S.D. Ohio April 6, 2017) (citing *Spence v. Sheets*, 675 F.Supp.2d 792, 802 (S.D. Ohio 2009) ("The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without enough proof to allow a rational trier of fact to find guilt beyond a reasonable doubt.") (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

*res judicata*. "It is well-settled that '[c]laims appearing on the face of the record must be raised on direct appeal, or they will be waived under Ohio's doctrine of *res judicata*.'" *Teitelbaum v. Turner*, No. 2:17-cv-583, 2018 WL 2046456, at *15 (S.D. Ohio May 2, 2018) (quoting *Hill v. Mitchell*, No. 1:98-cv-452, 2006 WL 2807017, at *43 (S.D. Ohio Sept. 27, 2006) (citing *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967))).

Petitioner violated the *res judicata* rule set forth in *Perry* when he failed to raise his claims on direct appeal, and, consequently, the first prong of the *Maupin* test is satisfied. Moreover, Ohio courts have consistently relied upon the doctrine of *res judicata* to refuse to review the merits of procedurally barred claims. *See, e.g., State v. Cole*, 2 Ohio St.3d 112 (1982). The Sixth Circuit has held that Ohio's doctrine of *res judicata* is an independent and adequate ground for denying federal habeas relief. *See, e.g., Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998). Turning to *Maupin's* independence prong, under the circumstances presented here, Ohio's doctrine of *res judicata* does not rely on or otherwise implicate federal law. Accordingly, the undersigned finds that the first three *Maupin* factors are satisfied.

To the extent that Petitioner raises any off-the-record claims of ineffective assistance of trial counsel, he likewise has procedurally defaulted those issues for review in these proceedings by failing to file a timely appeal in post-conviction proceedings. Petitioner filed a post-conviction petition asserting various claims of ineffective assistance of counsel. (ECF No. 13-1, PAGEID # 1184.) On June 7, 2017, the trial court denied that action. (PAGEID # 1201.) Petitioner did not file a timely appeal. Moreover, he may now no longer do so, as Ohio does not

allow delayed appeals in post-conviction proceedings. *See Brown v. Clipper*, No. 5:14-cv-1406, 2016 WL 5173331, at *23 (N.D. Ohio March 8, 2016); Ohio Appellate Rule 5(A). The state courts were never given the opportunity to enforce the procedural rule at issue due to the nature of Petitioner's procedural default.

> The third *Maupin* factor, whether the state procedural rule is an adequate and independent state ground, is also satisfied. Ohio App. R. 5(A)'s inapplicability to civil cases, and specifically, post-conviction relief proceedings, is firmly established and regularly followed by Ohio courts. *See Carley v. Hudson*, 563 F.Supp.2d 760, 776 (N.D. Ohio 2008) (adopting report and recommendation of Vecchiarelli, M.J.) (citing *State v. Williams,* 2006 WL 2949011, at *1 (Ohio Ct. App. 2006) ("Because post-conviction proceedings are civil in nature, App.R. 5(A) may not be used to seek leave from the denial of a post-conviction action where the time for an appeal as of right as provided in App.R. 4 has passed."); *State v. Johnson*, 2007 WL 2983890, at *1 (Ohio Ct. App. October 15, 2007) ("[T]he Supreme Court of Ohio has specifically held that App.R. 5(A) is not available on appeals regarding a post-conviction relief determination."); *State v. Nichols*, 11 Ohio St.3d 40, 43, 463 N.E.2d 375 (Ohio 1984)).

*Id*.

In claim six, Petitioner asserts that prosecution witnesses improperly vouched for the veracity of the alleged victim. Petitioner raised this same issue on direct appeal; however, the state appellate court reviewed the claim for plain error only, due to his failure to object:

> Fetherolf argues that the trial court erred by allowing several of the State's witnesses to provide testimony that he characterizes as vouching for the veracity of A.C.'s statements.
>
> Standard of Review
>
> {¶ 29} We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *State v. Lauf*, 3d Dist Putnam No. 12–16–06, 2017–Ohio–608, ¶ 54, citing *State v. Cassel*, 2d Dist. Montgomery No. 26708, 2016–Ohio–3479, ¶ 13, citing *State v. Graham*, 58 Ohio St.2d 350 (1979), and *State v. Morris,* 132 Ohio St.3d 337, 2012–Ohio–2407, ¶ 19. An abuse of discretion constitutes a decision that is arbitrary, capricious, or grossly unsound. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).
>
> {¶ 30} However, where Fetherolf did not object to an evidentiary issue, we review his arguments on appeal for plain error. *State v. Mammone*, 139 Ohio St.3d 467,

2014–Ohio–1942, ¶ 69, reconsideration denied, 139 Ohio St.3d 1487, 2014–Ohio–3195, and cert. denied, 135 S.Ct. 959 (2015). We take notice of plain error "with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. To prevail under plain error, Fetherolf must show that an error occurred, that the error was plain, and that but for the error, the outcome of the trial clearly would have been otherwise. *Mammone* at ¶ 69, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

Alleged Errors and Analysis

{¶ 31} On appeal, Fetherolf argues that several of the State's witnesses testified to their opinion of the veracity of A.C.'s statements. Specifically, Fetherolf contends that the emergency room physician, Dr. McManus, and the SANE, Teresa Warnimont testified that A.C. was credible and that such testimony was improper. Notably, Fetherolf acknowledges in his brief that he did not object to these purportedly erroneous statements at the trial court level, and thus we review their admissibility for plain error.

{¶ 32} It is apparent from a review of the record that Fetherolf mischaracterizes the testimony in the record on appeal. For instance, in his brief he contends that "[b]oth Dr. McManus and [the SANE] testif[ied] that, in their expert opinion, A.C. and her mother are credible." (Appt.'s Br. at 16). He also argues that Detective Flanagan and Kaitlyn Ruddy, an intake caseworker at the department of job and family services, testified that that A.C. was credible. These claims are simply inaccurate and do not reflect the testimony. There was testimony from some of these witnesses that A.C. and her mother were consistent in their statements, but these witnesses never testified specifically that A.C. was credible.

{¶ 33} Fetherolf seems to contend that because these witnesses testified that A.C.'s statements were consistent the witnesses were effectively testifying that A.C. was credible. Fetherolf seeks this Court to essentially make a ruling that a witness cannot testify that a statement is consistent because it implies that the statement is credible. However, a statement could be consistent and still be a complete fabrication. Whether a statement being consistent makes it more or less credible is a factual determination to be made by the finder-of-fact. Thus we do not find any of the witnesses' statements related to any consistency of A.C.'s disclosures to be error, let alone plain error.

{¶ 34} Nevertheless, Fetherolf does point us to one specific incident in the testimony of Teresa Warnimont, the SANE, wherein Warnimont arguably went beyond testifying that A.C.'s statements were consistent. That segment, cited by Fetherolf, reads as follows.

Q [Prosecutor]: We have just gone through, basically, what you did at Children's Hospital on September 24th of 2013 for the Rape kit. Right?

A [Warnimont]: Yes.

Q: When you are doing that work, do you specifically look for items of interest?

A: Yes, we would look for any red marks or anything unusual on the patient's body.

Q: If, upon your examination, you do not see an indication of any type of injury or trauma to the vaginal area, does that rule out whether or not there's been sexual abuse?

A: No, it does not.

Q: Based on your training, experience and education, why is that?

A: The tissue in the ano-genital area is very vascularized, so it heals very easily. It, also, is very elastic, so it stretches easy. It is not uncommon to have no findings.

Q: Based on your training, education and experience, what have you learned about child disclosure in these type of cases?

A: That what they say happened is what happened and we treat them and give them the support that they need after the disclosure.

Q: That's how you handle them?

A: Correct.

(March 9, 2016, Tr. at 33–34).

{¶ 35} Fetherolf argues that the preceding statement wherein the SANE testified that "what they say happened is what happened" constituted improper vouching for the victim's credibility. Contrary to Fetherolf's argument it seems that the SANE may have been merely saying that she "handled" the allegations for purposes of examination as though what the child said happened is what happened.

{¶ 36} However, to the extent that the SANE was testifying that all children, including A.C., are always telling the truth when they disclose, it would be an overly broad and likely improper statement. Nevertheless, even assuming that the preceding testimony of the SANE was error and should not have been introduced, we cannot find that it was plain error in this instance.

{¶ 37} In this case the consistent statements of A.C. were corroborated by the DNA evidence. The jury was also able to see A.C.'s deposition and at least draw inferences from A.C.'s demeanor as to whether she may have been the victim of sexual abuse or not. We simply cannot find that even if we read the SANE's isolated

statement in the worst possible light that it was so egregious that it rose to the level of plain error or that without the statement the outcome of the trial would have been different. Therefore, we do not find Fetherolf's arguments well-taken, and his first assignment of error is overruled.

*State v. Fetherolf*, 2017 WL 1316207, at *6-7.

Petitioner thereby has procedurally defaulted this claim for review in these proceedings. *See Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001); *Norton v. Sloan*, No. 1:16-cv-854, 2017 WL 525561, at *12 (N.D. Ohio Feb. 9, 2017) (citing *Durr v. McLaren*, No. 15-1346, 2015 WL 5101751, at *2 (6th Cir. Aug. 28, 2015)). The United States Court of Appeals for the Sixth Circuit has held that Ohio's contemporaneous-objection rule constitutes an adequate and independent state ground to preclude federal habeas review. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334-35 (6th Cir.) (citation omitted), *cert. denied sub nom. Wogenstahl v. Robinson*, 568 U.S. 902 (2012); *Awkal v. Mitchell*, 613 F.3d 629, 648-49 (6th Cir. 2010), *cert. denied,* 562 U.S. 1183 (2011). The state appellate court's plain error review does not constitute a waiver of the state's procedural default rules. *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006), *cert. denied sub nom. Keith v. Houk*, 549 U.S. 1308 (2007). Further, any alternative ruling on the merits does not remove the procedural default. *See Conley v. Warden, Chillicothe Correctional Inst.*, 505 F. App'x 501, 506 (6th Cir. 2012) (citing *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989); *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998)).

Thus, Petitioner has procedurally defaulted the foregoing issues presented in habeas corpus claims one through seven and nine.

**b. Cause and Prejudice**

Petitioner may still obtain review of these claims on the merits, if he establishes cause for his procedural defaults, as well as actual prejudice. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[,]

'. . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule.'" *Coleman,* 501 U.S. at 753 (quoting *Murray,* 477 U.S. at 488). It is Petitioner's burden to show cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (internal citation omitted)). A petitioner's pro se status, ignorance of the law, or ignorance of procedural requirements are insufficient bases to excuse a procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004). Instead, to establish cause, a petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." Instead, in order to establish cause, a petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007), *cert. denied sub nom. Hartman v. Bobby*, 554 U.S. 924 (2008).

As cause for his procedural defaults and in habeas corpus claim eight, Petitioner asserts the ineffective assistance of appellate counsel. Such a claim may constitute cause for a procedural default, *see Smith v. State of Ohio Dept. of Rehab. & Corr.*, 463 F.3d 426, 432 (6th Cir. 2006) (citation omitted), so long as it has been presented to the state courts, and is not, itself, procedurally defaulted. *See Monroe v. Houk*, No. 2:07-cv-258, 2009 WL 2898520, at *25 (S.D. Ohio Sept. 8, 2009) (citing *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000)). Here, Petitioner asserted that he was denied the effective assistance of appellate counsel in Rule 26(B) proceedings, because his attorney failed to raise on appeal a claim of insufficiency of the evidence.[7] (ECF No. 13-1, PAGEID # 1213.) The Court will consider the merits of this claim in order to determine whether Petitioner has established cause for his procedural default of claim two.

---

[7] The remaining issues Petitioner referred to in Rule 26(B) proceedings had been raised on direct appeal.

### c. Ineffective Assistance of Appellate Counsel

The state appellate court denied Petitioner's Rule 26(B) application as follows:

> Upon consideration the Court finds that the four additional assignments of error raised in Appellant's application fail to show any genuine issue as to whether he was deprived of the effective assistance of counsel on appeal. . . . applying the analysis of *Strickland v. Washington*, 466 U.S. 668 (1984). The additional assignments of error include issues actually raised by appellate counsel on appeal and other issues devoid of any merit. As such, the application does not show that appellate counsel's performance fell below an objective standard of reasonable representation or that there is any reasonable probability that the result would have been different. Accordingly, the application is not well taken.

(*Judgment Entry*, ECF No. 13-1, PAGEID # 1254.)

The Court considers this claim *de novo* when determining whether a petitioner can establish cause for a procedural default. *See Hively v. Warden*, 2018 WL 722864, at *7 (S.D. Ohio Feb. 5, 2018) (citing *Hall v. Vasbinder*, 563 F.3d 222, 236-37 (6th Cir. 2009) ("An argument that ineffective assistance of counsel should excuse a procedural default is treated differently than a free-standing claim of ineffective assistance of counsel. The latter must meet the higher AEDPA standard of review, while the former need not.")

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984). *Strickland* requires a petitioner claiming the ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. *Id.* at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir.), *cert. denied sub. nom. Hale v. Hoffner*, 134 S. Ct. 680 (2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that

counsel's representation fell below an objective standard of reasonableness.'" *Poole v. MacLaren*, 547 F. A'ppx 749, 754 (6th Cir. 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (internal quotation marks omitted)); (citing *Strickland*, 466 U.S. at 687), *cert. denied*, 135 S. Ct. 122 (2014). To make such a showing, a petitioner must overcome the "strong [ ] presum[ption]" that his counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 687. "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

The Fourteenth Amendment's Due Process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The question in a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16).

Additionally, when determining if the evidence was sufficient to support a petitioner's conviction, the reviewing court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson*, 443 U.S. at 326). Instead, "a reviewing court 'faced with a record of historical

facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id*. at 296–97 (quoting *Jackson*, 443 U.S. at 326).

The jury convicted Petitioner on one count of rape, in violation of O.R.C. § 2907.05(B), for engaging in sexual conduct with A.C., a child of seven years, on or about September 22, 2013; and one count of intimidation of a witness, in violation of O.R.C. § 2921.04(B), in that he knowingly and by force or unlawful threat of harm attempted to influence, intimidate or hinder the alleged victim in the prosecution of criminal charges. (*See Indictment*, ECF No. 13.)[8] In view of the factual findings of the state appellate court, and when viewing the evidence in the light most favorable to the prosecution, the evidence plainly is constitutionally sufficient to sustain Petitioner's convictions. Therefore, Petitioner cannot establish the denial of the effective assistance of appellate counsel under *Strickland* based on his attorney's failure to raise this issue on appeal. He likewise has failed to establish cause for his procedural default of his claim of insufficiency of the evidence.

Petitioner's remaining allegations of ineffective assistance of appellate counsel are waived because he failed to present those same issues to the state appellate court. *See Smith v. Warden, Toledo Corr. Inst.*, 780 F. App'x 208, 223 (6th Cir. 2019) ("[T]here is no right to file successive applications for reopening under [Rule] 26(B). . . . Once ineffective assistance of counsel has been raised and adjudicated, *res judicata* bars its relitigation.") (quoting *State v. Twyford*, 106 Ohio St.3d 176 (2005) (citation and internal quotation marks omitted) (other citation omitted).

### d. Actual Innocence

---

[8] The trial court merged Petitioner's sentence on gross sexual imposition with his rape conviction. (*Journal Entry of Sentence*, ECF No. 13, PAGEID # 812.)

The United States Supreme Court has held that a claim of actual innocence may be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray*, 477 U.S. at 496. In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally-barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Id.* at 315 (quoting *Herrera v. Collins,* 506 U. S. 390, 404 (1993)).

The actual innocence exception allows a petitioner to pursue his constitutional claims if it is "more likely than not" that new evidence—not previously presented at trial—would allow no reasonable juror to find him guilty beyond a reasonable doubt. *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005). The Sixth Circuit has offered the following explanation of the actual innocence exception:

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316, 115 S.Ct. 851, 130 L.Ed.2d 808. Thus, the threshold inquiry is whether "new facts raise[ +] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of

constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id*. at 321, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

*Souter*, 395 F.3d at 589–90 (footnote omitted).

Because Petitioner fails to satisfy these standards, the actual innocence exception does not operate to save his otherwise procedurally defaulted claims.

Petitioner has procedurally defaulted the foregoing issues raised in claims one through seven and nine.

## X.  Disposition

For the foregoing reasons, it is **RECOMMENDED** that this action be **DISMISSED**.

### Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of

the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

 s/ *Elizabeth A. Preston Deavers*
Elizabeth A. Preston Deavers
Chief United States Magistrate Judge

Date:  February 7, 2020